**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.                                      No. 99-4814

GLENNIS L. BOLDEN,
          *Defendant-Appellant.*

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.                                      No. 99-4873

CLIFFORD E. BOLDEN,
          *Defendant-Appellant.*

Appeals from the United States District Court
for the Western District of North Carolina, at Asheville.
Lacy H. Thornburg, District Judge.
(CR-97-329)

Argued: October 31, 2002

Decided: April 3, 2003

Before TRAXLER, KING, and GREGORY, Circuit Judges.

Affirmed in part, reversed in part, vacated in part, and remanded by
published opinion. Judge King wrote the opinion, in which Judge
Traxler and Judge Gregory joined.

## COUNSEL

**ARGUED:** Jefferson McClure Gray, ARENT, FOX, KINTNER, PLOTKIN & KAHN, P.L.L.C., Washington, D.C., for Appellants. David Alan Brown, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF:** A. James Siemens, SIEMENS LAW OFFICE, P.A., Asheville, North Carolina, for Appellant Clifford Bolden. Robert J. Conrad, Jr., United States Attorney, Brian Lee Whisler, Assistant United States Attorney, Karen Elise Eady, Assistant United States Attorney, Charlotte, North Carolina, for Appellee.

---

## OPINION

KING, Circuit Judge:

Glennis and Clifford Bolden appeal their multiple convictions and separate sentences in the Western District of North Carolina, resulting from charges arising out of a complex Medicaid fraud scheme. In their appeals, the Boldens challenge their 1998 convictions for money laundering and a related money laundering conspiracy, and Ms. Bolden challenges several of her convictions for the submission of false claims to the Government. They also challenge their sentences in several respects. As explained below, we affirm their convictions, but we reverse in part and vacate and remand their sentences in part.

### I.

### A.

The Boldens were indicted in December of 1997 by a grand jury in Asheville, North Carolina, and a superseding indictment was returned in October of 1998.[1] The indictment alleged that, from 1989 until 1995, the Boldens planned and perpetrated an elaborate fraud scheme, improperly obtaining tens of thousands of dollars from North

---

[1]In referring to the "indictment," we mean the 43-count superseding indictment, on which the Boldens were tried, convicted, and sentenced.

Carolina's Medicaid program ("Medicaid"). This fraud scheme was carried out through their operation of Emerald Health Care-Taylorsville ("Emerald Health"), a nursing facility owned by Henry Lane, Ms. Bolden's father.[2] The fraud scheme had numerous components, but the object of each was the same: the illegal extraction of monies from Medicaid for the benefit of one or both of the Boldens.

In November of 1998, after a nine-day jury trial in Asheville, the Boldens were convicted of multiple offenses. In particular, each was convicted of conspiracy to commit mail and wire fraud (in contravention of 18 U.S.C. § 371); two counts of submitting false claims to the Government (in violation of 18 U.S.C. § 287); six counts of filing false income tax returns (in violation of 26 U.S.C. § 7206(1)); six substantive counts of money laundering (in violation of 18 U.S.C. § 1956(a)(1)); and a separate count of money laundering conspiracy (in contravention of 18 U.S.C. § 1956(h)). Ms. Bolden was also convicted on eighteen separate false claims charges.

On August 30, 1999, a probation officer submitted pre-sentence reports (the "PSRs") to the district court on the Boldens. The parties then submitted objections to the PSRs and, on October 7, 1999, the court conducted sentencing hearings. Ms. Bolden received 140 months in prison, and Mr. Bolden was sentenced to a term of fifty-seven months. In addition, Ms. Bolden was fined $1,700, and Mr. Bolden was fined $800. The Boldens were each required to make $146,719 in restitution to the Internal Revenue Service.[3]

Following sentencing, the Boldens filed timely notices of appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

---

[2]Mr. Lane was also charged in the indictment. He entered into a deferred prosecution agreement with the Government, however, and consented to pay $1,000,000 in restitution and penalties to Medicaid.

[3]Because Mr. Lane, as part of his deferred prosecution agreement, paid $1,000,000 in restitution and penalties to Medicaid, the Government stipulated, for purposes of the Boldens' sentencing, that full restitution had been made to Medicaid.

## B.

In their appeals, the Boldens raise multiple challenges to their convictions and sentences. In seeking reversal of their convictions, they assert the following (the "Conviction Issues"):

(1) that the evidence was insufficient to support their convictions on the money laundering counts;

(2) that their convictions for money laundering conspiracy are flawed because:

a. the charge of money laundering conspiracy, in Count Thirty-Seven of the indictment, was legally deficient;

b. the court committed reversible error in its instructions by constructively amending the money laundering conspiracy charge; and

c. the evidence was insufficient to support their convictions for money laundering conspiracy; and

(3) with respect to Ms. Bolden, that the evidence was insufficient to sustain her convictions on the eighteen separate false claims charges.

The Boldens also raise assertions of error with regard to their sentences (the "Sentencing Issues"), specifically maintaining that:

(1) the court erred in grouping their fraud and money laundering convictions;

(2) the court failed to make adequate factual findings on the sentencing issues in dispute; and

(3) to the extent the court's factual findings were adequate, they were clearly erroneous.[4]

---

[4]If the sentencing court's factual findings are adequate, the Boldens assert that the court clearly erred by (a) improperly calculating fraud

Before turning to their contentions, we review the factual underpinnings for the Boldens' convictions and sentences.[5]

## II.

Between 1989 and 1995, Ms. Bolden served as Emerald Health's Director of Operations and as Supervisor of its Ventilator Unit. As Director of Operations, she approved Emerald Health's payments to vendors, authorized its capital purchases, transferred funds between its bank accounts, and directed its efforts to obtain reimbursements from Medicaid. In sum, she was responsible for most of the administrative and financial decisions of Emerald Health. Beginning in 1990, and until his resignation in early 1993, Mr. Bolden worked as Emerald Health's Director of Maintenance. In that capacity, he ordered supplies and supervised Emerald Health's housekeeping and maintenance staff.

## A.

The Boldens utilized their relationships with Emerald Health to manipulate North Carolina's Medicaid reimbursement system.[6] The

---

loss; (b) finding that Ms. Bolden occupied a position of trust; and (c) finding that Emerald Health's residents were vulnerable victims of Ms. Bolden's fraudulent activity.

[5]The Boldens challenge the sufficiency of the evidence on several of their convictions, as well as the sufficiency of the evidence underlying the court's sentencing rulings. On the Conviction Issues, we review the facts in the light most favorable to the Government; with respect to the Sentencing Issues, we review the facts in the light most favorable to the district court's determinations. *United States v. Wilkinson*, 137 F.3d 214, 217-18 (4th Cir. 1998) ("Because the Defendants challenge the sufficiency of the evidence . . . we present the facts in the light most favorable to the government."); *United States v. Brown*, 314 F.3d 1216, 1221 (10th Cir. 2003) ("Evidence underlying a district court's sentence is reviewed by viewing the evidence, and inferences drawn therefrom, in the light most favorable to the district court's determination.").

[6]Approximately 80% of Emerald Health's residents were covered by Medicaid.

North Carolina Division of Medical Assistance (the "DMA")[7] admin-
isters Medicaid, a healthcare program for low-income individuals par-
tially funded by the federal government. Pursuant to its mandate,
Medicaid reimburses nursing facilities, such as Emerald Health, for
their treatment and care of Medicaid patients.

In making such reimbursements, Medicaid initially disburses "pro-
spective payments" to nursing facilities that treat and care for Medic-
aid patients. N.C. Admin. Code tit. 10, r. 26H.0101. The "prospective
payment rate" on which such payments are based is an estimate of the
costs a nursing facility likely incurred in treating a Medicaid patient
for one day. Medicaid has established three separate prospective pay-
ment rates, corresponding to the three levels of care provided by nurs-
ing facilities — intermediate nursing care, skilled nursing care, and
ventilator care.[8] *Id.* r. 26H.0102. Each prospective payment rate con-
sists of two components, called "direct" and "indirect" components.
The direct component consists of those nursing facility costs attribut-
able specifically to patient care, such as nursing, food service, house-
keeping, and laundry. *Id.* The indirect component consists of nursing
facility costs related to property ownership, administration, and main-
tenance. *Id.* In order to receive its prospective payments, a nursing
facility periodically submits bills to Medicaid (the "Medicaid Bills").
The Medicaid Bills specify the number of days each Medicaid patient
resided in the nursing facility and the level of care each received.
After receiving and approving a nursing facility's Medicaid Bills,
Medicaid makes the prospective payments.[9]

At the end of each fiscal year, in order to ensure that the prospec-
tive payments were proper, Medicaid requires each nursing facility to
file an annual cost report (the "Cost Report"). *Id.* r. 26H.0104. A Cost

---

[7]In referring to Medicaid, we utilize the term to encompass the DMA.

[8]At the time Emerald Health submitted the bills to Medicaid that are
involved in this case, the daily prospective payment rates were: for venti-
lator care, approximately $260; for skilled nursing care, approximately
$80; and for intermediate nursing care, approximately $60.

[9]Nursing facilities in North Carolina actually submit their Medicaid
Bills electronically through Electronic Data Systems ("EDS"), a Medic-
aid contractor in Raleigh, North Carolina. EDS, acting on behalf of Med-
icaid, then makes payments to the nursing facilities by wire transfer.

Report details both the direct and indirect costs a nursing facility *actually incurred* in treating and caring for Medicaid-eligible patients. If a nursing facility's actual direct costs are less than the direct cost component of the prospective payments it has already received, the facility is obliged to repay the difference to Medicaid. If, however, the nursing facility's actual direct costs exceed the direct cost component of the prospective payments the facility has received, Medicaid issues a "settlement payment" to the facility. *Id.* r. 26H.0102.

In contrast to direct costs, Medicaid does not make settlement payments, or require repayment, for the indirect cost component of a nursing facility's prospective payments. *Id.* In other words, unlike with direct costs, Medicaid does not make settlement payments to nursing facilities that expended more in indirect costs than was provided for in their prospective payments. By the same token, to the extent a nursing facility does not spend the portion of its prospective payments dedicated to indirect costs, it is under no obligation to repay Medicaid. Therefore, to the extent a nursing facility can characterize its costs as direct costs, the greater its Medicaid reimbursement.

## B.

In carrying out their fraud scheme, the Boldens manipulated Medicaid's reimbursement system in several respects in order to inflate the Medicaid payments received by Emerald Health. Of importance here, the scheme included the following:

(1)  Ms. Bolden, as Emerald Health's agent, entered Emerald Health into lease agreements which were used for fraudulent purposes (the "Lease Transactions");

(2)  the Boldens implemented a plan to circumvent Medicaid's "related party" regulations (the "Related Party Transactions");

(3)  Ms. Bolden utilized Emerald Health to bill Medicaid for patients no longer in the nursing facility, and she miscategorized the levels of care provided to various patients on the Medicaid Bills, as well as on the Cost Reports (the "False Patient Billing");

(4)   Ms. Bolden used Emerald Health funds to purchase an automobile for her personal use (the "Automobile Purchase");

(5)   Ms. Bolden misclassified employees' salaries as direct costs on the Cost Reports (the "False Salary Classifications"); and

(6)   Ms. Bolden submitted improper expenses to Medicaid for equipment purchased by Emerald Health from a medical supplies company called Aequitron (the "Aequitron Invoices").[10]

These separate aspects of the fraud scheme are further explained below.

### 1.   *The Lease Transactions*

Beginning in 1991, Ms. Bolden caused Emerald Health to enter into certain lease transactions that were used for fraudulent purposes. She perpetrated this aspect of the scheme with the assistance of Buford "Sonny" Nelson.[11] She and Nelson used Nelson Enterprises, which was Nelson's office supplies business, to arrange leases between Emerald Health and several leasing companies for the purpose of extracting monies from Medicaid.

In a typical lease transaction, Nelson would contact a leasing company (the "Lessor") and, on behalf of Nelson Enterprises, represent that he had a customer, Emerald Health, that was interested in leasing nursing facility equipment. Thereafter, the Lessor would enter into a

---

[10]Although the Boldens personally obtained substantial sums of money from the fraud scheme between 1989 and 1995, they failed to report those monies on their income tax returns. As a result, they were each convicted of six counts of filing false federal tax returns. Their tax convictions are not on appeal.

[11]Although Nelson was involved in several aspects of the fraud scheme, he was not charged in the indictment. He entered into a plea agreement with the Government and was a key witness in the Boldens' trial.

lease agreement with Emerald Health. Pursuant to the agreement, the Lessor would agree to purchase the equipment from Nelson Enterprises and lease it to Emerald Health. In each transaction, the equipment was to be delivered directly from Nelson Enterprises to Emerald Health.

When they initiated the Lease Transactions, Ms. Bolden and Nelson had no intention of providing equipment for Emerald Health. Instead, Nelson Enterprises would simply invoice the Lessors, indicating that the leased equipment had been delivered to Emerald Health. Before disbursing its payment to Nelson Enterprises, a Lessor would contact Emerald Health to confirm receipt of the equipment. Ms. Bolden would assure the Lessor that Emerald Health had received and accepted the leased equipment. The Lessor would then disburse its payment to Nelson Enterprises. Instead of delivering the leased equipment to Emerald Health, however, Nelson would either send it a portion of the equipment ordered or none at all. Nelson would then divide the payment received from the Lessor between himself and Ms. Bolden. Thereafter, pursuant to the terms of the lease agreement, Emerald Health was obligated to make lease payments to the Lessor.

For example, in July of 1993, Nelson brokered a lease between Emerald Health and a company called North Star Leasing ("North Star"). Prior to arranging the North Star lease, Ms. Bolden borrowed $11,800 from Nelson for the down payment on a vehicle for Mr. Bolden. Nelson then brokered the North Star lease, in the sum of $23,500, for the purpose of financing Emerald Health's purchase of bathtub equipment from Nelson Enterprises. After receiving an invoice from Nelson Enterprises and confirming with Ms. Bolden that the bathtub equipment had been delivered to Emerald Health, North Star disbursed a $23,500 payment to Nelson Enterprises. Nelson kept $11,800 as repayment of his earlier loan to Ms. Bolden, paid himself $2,700 as a broker's fee, and gave Ms. Bolden the remaining $9,000. This transaction obligated Emerald Health to make monthly payments of approximately $1,000 to North Star for three years for bathtub equipment it never received.

Between 1991 and 1993, Ms. Bolden and Nelson involved Emerald Health in seven Lease Transactions. In the end, Nelson Enterprises

received over $200,000 from seven Lessors. Only $23,000 of that sum was applied to actual equipment delivered to Emerald Health. The remaining $177,000 was divided between Nelson and Ms. Bolden. Nelson received approximately $33,000 and Ms. Bolden received approximately $144,000, $11,800 of which was used to purchase the automobile for Mr. Bolden.[12]

Ms. Bolden classified Emerald Health's lease payments as indirect costs on its 1991 and 1992 Cost Reports. On the 1993 and 1994 Cost Reports, however, over $33,500 in payments on the Lease Transactions were misclassified as direct costs, thereby increasing Emerald Health's Medicaid receipts for 1993 and 1994.

## 2. *The Related Party Transactions*

As part of the scheme, the Boldens circumvented Medicaid's regulations on related party transactions. In submitting Cost Reports to Medicaid, a nursing facility must disclose whether any of its costs resulted from transactions with "related parties," i.e., individuals or businesses having immediate family relationships with the facility. N.C. Admin. Code tit. 10, r. 26H.0104. For related party transactions, Medicaid reimburses a nursing facility for only the related party's actual costs for goods or services provided to the facility.

In 1993, Mr. Bolden resigned from Emerald Health, due to disagreements with his father-in-law, and established a nursing supplies business called Carolina Supply Company ("Carolina Supply"). That same year Nelson Enterprises failed, and Ms. Bolden decided to extract extra monies from Medicaid by having Emerald Health purchase supplies from Carolina Supply at inflated prices. Due to Medic-

---

[12]Ms. Bolden also misappropriated cash from Emerald Health with the assistance of Nelson, activity the Government characterized as a "kickback" operation. For example, in August of 1993, Nelson Enterprises submitted an invoice to Emerald Health in the sum of $2,332, purportedly for the purchase by Emerald Health of a copying machine. Although Emerald Health paid the invoice, it did not receive the copier. Instead, when Nelson Enterprises received payment from Emerald Health, Nelson gave $2,000 to Ms. Bolden and kept $332 for himself. Ms. Bolden listed this "copier purchase" as a direct cost on the 1993 Cost Report.

aid's limitations on related party transactions, she concealed Emerald Health's purchases from Carolina Supply by having Nelson create a sham "business" to act as an intermediary between Carolina Supply and Emerald Health.

Nelson then established a bank account for the sham business, which was called Industrial Consumer Products ("Industrial"). Carolina Supply would bill Industrial for various supplies it purportedly shipped to Emerald Health, and Industrial would in turn bill Emerald Health, at inflated prices, for those same supplies. Although the supplies were rarely delivered as ordered, Emerald Health would pay the Industrial bills, and Industrial would in turn pay the Carolina Supply bills. Nelson characterized his role in the Related Party Transactions as "just selling paper."

Emerald Health sometimes paid Industrial's invoices even though no supplies were delivered to Emerald Health. In other instances, Nelson submitted Industrial invoices which Emerald Health did not pay, and for which no supplies were delivered (the "Fictitious Invoices"). The Fictitious Invoices were used solely to increase Emerald Health's Medicaid reimbursements.

When supplies were delivered, Emerald Health was usually charged 40% to 70% more than Carolina Supply's actual costs. For example, in 1993, Carolina Supply purchased washcloths, bath towels, bibs, and fitted sheets at an approximate cost of $5,700. In September of 1993, Industrial charged Emerald Health approximately $15,500 for those items, which Emerald Health paid. Industrial, on November 19, 1993, issued a $13,000 check to Carolina Supply for those same items. Nelson thus profited by about $2,500, while Carolina Supply made more than $7,000.

In carrying out the Related Party Transactions, Industrial submitted a total of eight invoices to Emerald Health.[13] Two such invoices, total-

---

[13]In March of 1994, Ms. Bolden had Nelson backdate three Industrial invoices to reflect non-existent sales transactions between Industrial and Emerald Health in August of 1993 (the "Backdated Invoices"). The Backdated Invoices were then included on the 1993 Cost Report, thereby increasing Emerald Health's net receipts from Medicaid for that year.

ling about $7,000, were never paid. Between September of 1993 and March of 1994, Emerald Health paid Industrial approximately $54,300 on the remaining six invoices, and Industrial made corresponding payments to Carolina Supply, the related party, of almost $47,000. The cost of the supplies actually delivered to Emerald Health was about $31,000. Ms. Bolden classified the eight invoices as direct costs on the 1993 and 1994 Cost Reports, failing to reveal that they were Related Party Transactions.

### 3.  *The False Patient Billing*

As part of the fraud scheme, Ms. Bolden also caused Emerald Health to systematically charge Medicaid for patients who were no longer in its nursing facility due to their hospitalization, discharge, or death. For example, Emerald Health billed Medicaid for its care of patient Beulah Wallace from April 1, 1994, until April 27, 1994. Ms. Wallace, however, died on April 3, 1994. Emerald Health similarly billed Medicaid for its care of patient Ardna Church from June 1, 1994, until September 22, 1994, but Ms. Church had been discharged from the facility on June 16, 1994. As a result of the False Patient Billing, Ms. Bolden was convicted on eighteen false claims charges, and Medicaid was overcharged by more than $63,000.[14]

### 4.  *The Automobile Purchase*

In September of 1993, Nelson assisted Ms. Bolden in concealing the use of Emerald Health funds to purchase an automobile for her personal use. In this aspect of the fraud scheme, Ms. Bolden first issued an Emerald Health check for approximately $18,000, payable to NationsBank. Nelson, purporting to act on behalf of Emerald Health, took the check to NationsBank in Statesville, North Carolina, where he purchased a cashier's check in that sum, payable to Nelson Enterprises. Nelson next drove to nearby Newton, and, using the cashier's check, purchased a $17,000 cashier's check from Southern

---

[14]In addition to billing Medicaid for patients not in its nursing facility, Emerald Health falsified its Medicaid Bills for patients it actually treated. It charged Medicaid at the more costly ventilator care rate for Medicaid patients, even though such patients actually received less costly intermediate or skilled nursing care. *See supra* note 8.

National Bank, payable to State Employees Credit Union. Nelson retained $1,000 as his "fee" and used the $17,000 cashier's check to purchase a vehicle for Ms. Bolden. These transactions served to conceal Ms. Bolden's use of Emerald Health's funds to purchase her personal automobile. The $18,000 Emerald Health check to NationsBank was reflected as an indirect cost on the 1993 Cost Report.

### 5.  *The False Salary Classifications*

As part of the fraud scheme, Ms. Bolden misclassified several employees' salaries as direct costs on the 1993 and 1994 Cost Reports. Specifically, she improperly classified her own salary, as well as those of an Emerald Health administrative assistant, two of its accounting clerks, a physician assistant, and a maintenance employee, as direct rather than indirect costs.[15] For example, Ms. Bolden designated Lori Gann as a "medical records clerk," rather than an accounting clerk, in order to misclassify Gann's salary as a direct cost on the 1993 and 1994 Cost Reports. By misclassifying these salaries, Ms. Bolden overstated Emerald Health's direct costs on the 1993 and 1994 Cost Reports by over $190,000.

### 6.  *The Aequitron Invoices*

On several occasions, Ms. Bolden caused Emerald Health's financial records to overstate expenses by making duplicative accounting entries, thereby double and triple-expensing certain purchases from a medical supplies company called Aequitron. In one instance, Emerald Health received invoices from Aequitron for medical supplies it had purchased, for approximately $2,000. Ms. Bolden misclassified these purchases as direct costs on Emerald Health's accounting ledger and on the 1993 Cost Report. She then obtained duplicate invoices from Aequitron and expensed them a second time, again misclassifying the

---

[15]The evidence at trial was that the salaries of the accounting clerks and the physician assistant were improperly reflected as direct costs on the 1993 and 1994 Cost Reports. Ms. Bolden's salary, as well as that of the administrative assistant and the maintenance employee, relate to the sentencing proceedings only, and were included in Ms. Bolden's fraud loss calculation.

duplicates as direct costs on Emerald Health's accounting ledger and on the 1993 Cost Report.

On another occasion, Emerald Health purchased ventilator equipment from Aequitron, which invoiced the equipment for approximately $64,000. Upon receiving the ventilator equipment, Ms. Bolden had a Lessor pay Aequitron for it, and Emerald Health then leased the equipment from the Lessor. Ms. Bolden recorded the $64,000 Aequitron invoice on Emerald Health's accounting ledger to reflect that Emerald Health had engaged in three such transactions. She then reported the three "purchases" of ventilator equipment as direct costs on the 1994 Cost Report.[16]

C.

In sum, the Boldens manipulated Medicaid's reimbursement system in several respects in order to inflate the Medicaid payments received by Emerald Health. Ms. Bolden caused Emerald Health to misrepresent the number of Medicaid patients it treated and cared for, to conceal the Related Party Transactions on the 1993 and 1994 Cost Reports, and to abuse the Medicaid reimbursement process by classifying its indirect costs as direct costs on those Cost Reports. By improperly classifying indirect costs as direct costs, Ms. Bolden succeeded in eliminating the repayments Emerald Health would have been obliged to make to Medicaid for 1993 and 1994.

During fiscal years 1990, 1991, and 1992, Emerald Health's actual direct costs were substantially less than the direct cost component of the prospective payments it received from Medicaid. As a result, Emerald Health was required to repay Medicaid the sums of $138,687, $102,501, and $318,695 for those years. By contrast, in fiscal years 1993 and 1994, it received settlement payments from Medicaid, amounting to $529 in 1993 and $163 in 1994.

With this background in mind, we turn to the issues raised by the Boldens in this case.

---

[16]The triple-expensing of the $64,000 Aequitron invoice was not in evidence at trial. It was used only as relevant conduct for purposes of Ms. Bolden's sentencing.

### III.   *THE CONVICTION ISSUES*

As explained above, the Boldens, in their separate appeals, challenge their money laundering and related conspiracy convictions. In addition, Ms. Bolden asserts that there was insufficient evidence to convict her on the eighteen separate false claims counts. We begin our analysis of their contentions on the Conviction Issues by examining the applicable standards of review.

### A.   *The Standards of Review*

First, in reviewing the sufficiency of evidence, a verdict must be upheld if there is substantial evidence, taking the view most favorable to the Government, to support it. *Glasser v. United States*, 315 U.S. 60, 80 (1942); *see also United States v. Bennafield*, 287 F.3d 320, 324 (4th Cir. 2002). Second, we review de novo a challenge to the validity of an indictment. *United States v. Loayza*, 107 F.3d 257, 260 (4th Cir. 1997). Finally, we review for abuse of discretion a district court's rulings on jury instructions. *United States v. Bostian*, 59 F.3d 474, 480 (4th Cir. 1995). In reviewing the adequacy of instructions, we "accord the district court much discretion and will not reverse provided that the instructions, taken as a whole, adequately state the controlling law." *Teague v. Baker*, 35 F.3d 978, 985 (4th Cir. 1994).

### B.   *The Money Laundering Convictions*

The Boldens first challenge the sufficiency of the evidence supporting their convictions for money laundering. Each of their six money laundering convictions, pursuant to 18 U.S.C. § 1956(a)(1), arose out of the Related Party Transactions.[17] Three of those convic-

---

[17]Pursuant to § 1956(a)(1) of Title 18, criminal penalties are provided for:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
>
> > (A)(i)   with the intent to promote the carrying on of specified unlawful activity; or

tions resulted from checks written by Emerald Health to Industrial, and the other three involved checks written by Industrial to Carolina Supply (collectively, the "Industrial Check Transactions").[18] As explained below, sufficient evidence supports the money laundering convictions.

### 1.    *The Money Laundering Issues*

In the common understanding, money laundering occurs when money derived from criminal activity is placed into a legitimate business in an effort to cleanse the money of criminal taint. The money laundering statute, however, as codified at 18 U.S.C. § 1956(a)(1), proscribes a much broader range of conduct, specifically prohibiting four distinct types of money laundering activity. In order to contravene § 1956(a)(1), a defendant must, first of all, know that the property involved in a "financial transaction" represents the "proceeds" of

---

> (ii)   with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or
>
> (B)   knowing that the transaction is designed in whole or in part—
>
> > (i)   to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
> >
> > (ii)   to avoid a transaction reporting requirement under State or Federal law.

18 U.S.C. § 1956(a)(1).

[18]Each of the six money laundering counts (Counts Thirty-Eight through Forty-Three), after describing the financial transaction, further alleged, in its penultimate paragraph, the following:

> The defendants engaged in the financial transaction with the intent to promote the carrying on of the specified unlawful activity, that is with the intent to further the mail and wire fraud scheme and artifices, . . . and knowingly [sic] that the financial transaction was designed, in whole or in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity.

some "specified unlawful activity." If this "proceeds" element is satisfied, a money laundering violation occurs when a defendant conducts or attempts to conduct a financial transaction:

> (1)  intending to promote the carrying on of specified unlawful activity ("promotion money laundering"); or

> (2)  intending to engage in conduct contravening §§ 7201 or 7206 of the Internal Revenue Code; or

> (3)  knowing that the financial transaction is designed to conceal the nature of the proceeds of specified unlawful activity ("concealment money laundering"); or

> (4)  knowing that the transaction is designed to avoid a state or federal transaction reporting requirement.

The money laundering counts charged the Boldens with involvement in both promotion money laundering and concealment money laundering.[19] The instructions advised the jury that, in order to convict on those charges, it was obliged to find the Boldens involved in *both* promotion money laundering and concealment money laundering.[20] Accordingly, by its guilty verdict on the six money laundering counts,

---

[19]A single count of an indictment may permissibly allege either one or more of the types of money laundering contained in § 1956(a)(1). *See e.g.*, *United States v. Booth*, 309 F.3d 566, 572 (9th Cir. 2002) ("When a statute specifies two or more ways in which an offense may be committed, all may be alleged in the conjunctive in one count.").

[20]Although the instructions required the jury to find, in order to convict, that the Boldens had engaged in both promotion money laundering and concealment money laundering, such instructions were unnecessarily favorable to them. When an indictment alleges both promotion and concealment money laundering, a conviction can be premised on proof of *either*. *See United States v. LeDonne*, 21 F.3d 1418, 1427 (7th Cir. 1994) ("[W]here a statute defines two or more ways in which an offense may be committed, all may be alleged in the conjunctive in one count in order to adequately apprise the defendant of the government's intention to charge him under either prong of the statute."); *United States v. Street*, 66 F.3d 969, 974 (8th Cir. 1995) (same).

the jury found that they had each engaged in both types of money laundering.

The Boldens maintain that their money laundering convictions must be vacated for two reasons. First, they contend that the financial transactions on which their money laundering convictions are based, i.e., the Industrial Check Transactions, did not involve the "proceeds" of the mail and wire fraud that constituted the "specified unlawful activity" alleged in the indictment. Second, they assert that the Industrial Check Transactions failed to satisfy the statutory requirements of either promotion money laundering or concealment money laundering. For the reasons explained below, we reject each of these contentions.

### 2. *The "Proceeds" Element*

The Boldens first contend that the evidence failed to prove that the money laundering offenses involved the proceeds of the specified unlawful activity spelled out in the indictment. In particular, it charged their involvement in a mail and wire fraud scheme — an offense which qualifies as a "specified unlawful activity" under the relevant money laundering statute. The Boldens assert, however, that the mail and wire fraud activity consisted only of the submission of the 1993 and 1994 Cost Reports, and that it was not until the submission of those Reports that their fraud scheme generated proceeds. According to the Boldens, the Industrial Check Transactions — the financial transactions underlying the money laundering convictions — could not have involved the proceeds of the specified unlawful activity because they occurred *prior* to the submission of the 1993 and 1994 Cost Reports.

Contrary to the Boldens' contention, the money laundering statute does not require the underlying criminal activity be completed prior to the money laundering transactions. *See United States v. Butler*, 211 F.3d 826, 829 (4th Cir. 2000) ("Funds are criminally derived if they are derived from an already completed offense, *or* a completed phase of an ongoing offense." (internal quotation omitted) (emphasis added)). Thus, the key inquiry is not whether the specified unlawful activity was completed prior to the alleged money laundering transaction. Instead, we must determine whether the specified unlawful

activity generated proceeds prior to the money laundering, and whether the money laundering actually involved those criminally-derived proceeds.

We begin our analysis by noting that certain criminal activities can produce proceeds long before their completion. A mail fraud scheme, such as the Medicaid fraud scheme of the Boldens, is the prototype of an activity that can generate proceeds before the mailings take place. *See United States v. Mankarious*, 151 F.3d 694, 705 (7th Cir. 1998) ("A mail fraud scheme . . . can create proceeds long before the mailing ever takes place."). Indeed, as the Tenth Circuit recognized in *United States v. Massey*, 48 F.3d 1560, 1566 (10th Cir. 1995), a "'scheme to defraud' has a wider meaning than an individual act of fraud." A mail or wire fraud scheme often encompasses a range of activities that occur prior to, and culminate in, mail and wire submissions. Accordingly, in order to sustain the Boldens' money laundering convictions, there must simply have been sufficient evidence for the jury to "have inferred that the [proceeds] came from a fraudulent scheme and that the use of the mails furthered that scheme." *Mankarious*, 151 F.3d at 703.

The Boldens' scheme to defraud Medicaid cast a wide net, and it was not limited to the submission of the Cost Reports. The scheme included, *inter alia*, the False Patient Billing; the Lease Transactions; the creation and use of a sham company, Industrial; the submission of the Industrial invoices to Emerald Health; the receipt of the prospective payments; and the inclusion of the Related Party Transactions as direct costs on the 1993 and 1994 Cost Reports. The Cost Reports were simply used to justify the prospective payments that Emerald Health had already received. Accordingly, the mail and wire submissions were merely the culminating acts in a scheme that had begun long before. And although their fraud scheme may not have been consummated until the submission of the Cost Reports, the Boldens had completed a substantial part of the scheme prior to the Industrial Check Transactions.

For our purposes, the relevant fact is that the fraud scheme produced proceeds through the prospective payments prior to the financial transactions — the Industrial Check Transactions — on which the money laundering convictions were based. The 1993 and 1994 Cost

Reports merely justified Emerald Health's receipt of those prospective payments. *See United States v. Allen*, 76 F.3d 1348, 1361 (5th Cir. 1996) (concluding that fraud scheme "produces proceeds at the latest when the scheme succeeds in disgorging the funds from the victim and placing them into the control of the perpetrators"); *United States v. Morelli*, 169 F.3d 798, 800 (3d Cir. 1999) (concluding for purposes of money laundering statute "that the money became the proceeds of fraud as soon as it entered the hands of members of the scheme"). The prospective payments constituted the proceeds used by the Boldens in the Industrial Check Transactions. Accordingly, the contention that the money laundering offenses were not conducted with the "proceeds" of the fraud scheme must fail.

### 3.   *The "Promotion" and "Concealment" Issues*

Similarly unavailing is the contention that the Industrial Check Transactions failed to constitute either promotion money laundering or concealment money laundering. According to the Boldens, the Industrial Check Transactions were only used to carry on the legitimate business of Carolina Supply, and they thus did not qualify as promotion or concealment money laundering. Indeed, several courts have vacated money laundering convictions where the financial transactions were utilized for legitimate purposes. *See e.g.*, *United States v. Olaniyi-Oke*, 199 F.3d 767, 770 (5th Cir. 1999) (concluding there was no evidence that computers purchased in financial transaction charged as money laundering were to be used for "anything other than fully legal personal use"); *United States v. Calderon*, 169 F.3d 718, 721-22 (11th Cir. 1999) (determining there was no evidence "that Appellant's conduct furthered the alleged underlying narcotics trafficking"). For the reasons explained below, we reject this contention.

### a.   *Promotion Money Laundering*

Under the evidence, the Industrial Check Transactions were designed to avoid disclosing the Related Party Transactions to Medicaid, allowing the Boldens to evade Medicaid's regulatory requirements and charge Medicaid inflated costs. Further, Emerald Health's payments to Industrial compensated Nelson for his part in the scheme, encouraging his continued participation therein. Finally, Carolina Supply used the money it received from Industrial to purchase and

deliver part of the supplies Industrial billed to Emerald Health. These partial deliveries provided an aura of legitimacy to Emerald Health's payments to Industrial, allowing the Boldens to further conceal their scheme. Thus, the circumstances underlying the Industrial Check Transactions are sufficient to justify the finding that the Boldens committed promotion money laundering.

In other decisions, we have ruled similarly. For example, in *United States v. Wilkinson*, 137 F.3d 214 (4th Cir. 1998), we found the evidence sufficient to sustain convictions for promotion money laundering. There, the defendants had obtained loans from an insurance company by misrepresenting that the funds would be used to finance accounts receivable for physicians. The funds were instead employed to promote risky non-medical businesses. In their scheme, the defendants created a sham business for the purpose of handling the loans. The insurance company wired loan proceeds to the sham business, which transferred those proceeds to the non-medical businesses. We found the transactions to constitute promotion money laundering, in contravention of § 1956(a)(1)(A)(i), because, as Judge Hamilton explained, "the transfer of money from [the sham business] to the non-medical businesses was integral to the success of the overall scheme." *Id.* at 221. In this case, Industrial was a sham business, used solely to deceive Medicaid on the Related Party Transactions, and it was thus "integral to the success" of the scheme.

### b.  *Concealment Money Laundering*

The evidence also established that the Industrial Check Transactions constituted concealment money laundering, pursuant to § 1956(a)(1)(B)(i). On this point, the Boldens maintain that, while the Industrial Check Transactions were designed to avoid the requirements of the Medicaid regulations, they were not designed to conceal the fact that Emerald Health had obtained prospective payments from Medicaid. On this basis, they assert that their convictions for concealment money laundering are invalid.

Viewed in the proper light, however, the Industrial Check Transactions concealed the fact that the payments Medicaid made to Emerald Health were being used in the Related Party Transactions. As related above, *supra* Part II.B.2, the Boldens and Nelson created Industrial to

hide the fact that Emerald Health was ordering supplies from Carolina Supply, a related party. The Industrial Check Transactions concealed this arrangement and enabled Medicaid to be billed at inflated prices for the supplies ordered from Carolina Supply. Those transactions also concealed the fact that the money flowing into Carolina Supply, and ultimately to the Boldens, was derived from Medicaid funds.

The creation and use of sham businesses is highly relevant to the proof of concealment money laundering. The Fifth Circuit, in *United States v. Willey*, 57 F.3d 1374, 1385 (5th Cir. 1995), observed that the use of "a third party, for example, a business entity or a relative, to purchase goods on one's behalf or from which one will benefit usually constitutes sufficient proof of a design to conceal." And in *United States v. Ladum*, 141 F.3d 1328, 1333 (9th Cir. 1998), the Ninth Circuit, in an analogous situation, concluded that a defendant who concealed his ownership in a business from a bankruptcy trustee, through the use of "nominees who held themselves out as owners of the stores," had committed concealment money laundering. The court reasoned that the use of nominees "prevented the bankruptcy trustee from knowing that [the defendant] was the legitimate owner of the stores." *Id.* at 1340. Likewise, the Boldens' use of Industrial concealed the fact that Emerald Health was billing Medicaid (at inflated prices) for the Related Party Transactions. In sum, the evidence sufficiently proves the allegations of concealment money laundering.

## C.  *The Conspiracy Issues*

The Boldens also challenge, on three separate bases, their convictions for money laundering conspiracy, as charged in Count Thirty-Seven of the indictment. They contend, first, that Count Thirty-Seven was fatally defective; second, that the jury instructions on money laundering conspiracy amended the indictment; and third, that the evidence was insufficient to support their convictions of money laundering conspiracy.

### 1.

In analyzing the sufficiency of Count Thirty-Seven, we look first to the requirements of an indictment. A valid indictment must: (1) allege the essential facts constituting the offense; (2) allege each ele-

ment of the offense, so that fair notice is provided; and (3) be sufficiently distinctive that a verdict will bar a second prosecution for the same offense. *United States v. Smith*, 44 F.3d 1259, 1263 (4th Cir. 1995) (citing *Hamling v. United States*, 418 U.S. 87, 117 (1974)); *see also* Fed. R. Crim. P. 7(c)(1) ("The indictment . . . shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged."). As a basic proposition, an indictment is sufficient "'if it alleges an offense in the words of the statute.'" *United States v. Brandon*, 298 F.3d 307, 310 (4th Cir. 2002) (quoting *United States v. Wicks*, 187 F.3d 426, 427 (4th Cir. 1999)).

The Boldens contend that Count Thirty-Seven, which alleged a violation of 18 U.S.C. § 1956(h),[21] was defective in three respects: (1) it failed to allege any overt acts; (2) it failed to identify the specified unlawful activity that produced the proceeds they conspired to launder; and (3) it failed to specify the offense defined in § 1956(a)(1) or § 1957 that the Boldens conspired to commit.[22] We examine each of these three contentions in turn.

---

[21]Section 1956(h), the money laundering conspiracy statute, provides that "[a]ny person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." 18 U.S.C. § 1956(h).

[22]Count Thirty-Seven of the indictment alleged the money laundering conspiracy as follows:

The Grand Jury incorporates and realleges by reference all allegations set forth in the foregoing Introductory Paragraphs above and all overt acts alleged in Count One.

From in or about January, 1989 through in or about December, 1995, within the Western District of North Carolina, and elsewhere,

GLENNIS L. BOLDEN
and
CLIFFORD E. BOLDEN

did knowingly, willfully, and unlawful [sic] . . . conspire . . . with one another, to commit money laundering offenses . . . in violation of Title 18, United States Code, Sections 1956(a)(1) and 1957.

All in violation of Title 18, United States Code, Section 1956(h).

a.

The first of these specifications, that Count Thirty-Seven is defective for failing to allege overt acts, is baseless. The Boldens were charged with and convicted of money laundering conspiracy, pursuant to 18 U.S.C. § 1956(h), and § 1956(h) does not require an overt act to be either alleged or proven. As we observed in *United States v. Godwin*, 272 F.3d 659, 669 (4th Cir. 2001), "a conspiracy under 18 U.S.C. § 1956(h), as opposed to a conspiracy under 18 U.S.C. § 371, does not explicitly require proof of an overt act." In addressing a similar challenge to the drug conspiracy statute, the Supreme Court, in *United States v. Shabani*, 513 U.S. 10, 15 (1994), held that an overt act is not an element of 21 U.S.C. § 846. As the Court observed, Congress explicitly required the commission of an overt act as an element of the conspiracy defined in 18 U.S.C. § 371, and the Court concluded that Congress must be presumed to have acted deliberately in failing to include similar language in § 846. *Id.* at 14. The drug and money laundering conspiracy statutes — § 846 and § 1956(h) — are drawn in similar terms, and neither requires an overt act. *See United States v. Tam*, 240 F.3d 797, 802 (9th Cir. 2001) ("The language of 18 U.S.C. § 1956(h) is nearly identical to the language of 21 U.S.C. § 846, which the Supreme Court held . . . does not require proof of an overt act."); *see also United States v. Abrego*, 141 F.3d 142, 164 (5th Cir. 1998) ("Section 846 has language virtually identical to the language of § 1956(h)."). Thus, because an overt act is not an element of a § 1956(h) offense, there was no need for the grand jury to make such an allegation in Count Thirty-Seven.

b.

The Boldens next assert that Count Thirty-Seven failed to identify the "specified unlawful activity" that produced the proceeds they conspired to launder. We have observed that "[t]he core of money laundering . . . is the laundering transaction itself," and that "details about the nature of the unlawful activity underlying the character of the proceeds need not be alleged." *Smith*, 44 F.3d at 1265. In any event, Count Thirty-Seven spelled out the unlawful activity that produced the proceeds the Boldens conspired to launder.

Count Thirty-Seven incorporated and realleged the overt acts alleged in Count One, which charged the Boldens with violating the

general conspiracy statute (18 U.S.C. § 371). Those overt acts included allegations that the Boldens established Industrial to "avoid the federal rules governing related party transactions," that Industrial's invoices were included on the Cost Reports, and that, "as a result, Carolina Supply and [Industrial] generated profits from Medicaid reimbursement to the facility." Count One also alleged that Ms. Bolden "caused the submission of electronic billings to the Medicaid program which resulted in the interstate wiring of claims and payments between Raleigh, North Carolina and Dallas, Texas." In this context, the Boldens had ample notice of the details of the specified unlawful activity (mail and wire fraud) that generated the proceeds they conspired to launder, and any contention to the contrary must be rejected.

c.

Finally, the Boldens contend that Count Thirty-Seven is fatally flawed because it failed to specify a specific statutory object of the conspiracy, that is, which one of five offenses — the four defined in § 1956(a)(1) or § 1957's single offense — they conspired to commit.[23] Count Thirty-Seven was not required to allege the specific type of money laundering the Boldens conspired to commit; it was simply alleging a multiple-object conspiracy. Courts have uniformly upheld multiple-object conspiracies, and they have consistently concluded that a guilty verdict must be sustained if the evidence shows that the conspiracy furthered any one of the objects alleged. *Griffin v. United States*, 502 U.S. 46 (1991); *United States v. Hudgins*, 120 F.3d 483, 487 (4th Cir. 1997). For example, the Third Circuit upheld a conviction where the indictment alleged a conspiracy with three statutory objects — including violations of § 1956(a)(1) and § 1956(a)(2). *See United States v. Carr*, 25 F.3d 1194, 1201-02 (3d Cir. 1994). The court observed that the convictions could be sustained if the defendants "knowingly and intentionally committed acts furthering any of

---

[23]The five statutory objects referred to in Count Thirty-Seven include the four types of money laundering offenses contained in § 1956(a)(1), *see supra* Part III.B.1, plus the money laundering offense contained in § 1957. Under § 1957, it is unlawful to engage in a monetary transaction of more than $10,000 with property derived from a specified unlawful activity.

the three objects of the conspiracy." *Id.* at 1202. Pursuant to the fore-going, this contention must also be rejected.

2.

The Boldens next contend that the trial court constructively amended Count Thirty-Seven by impermissibly broadening the identity of the members of the conspiracy. That charge alleged that the Boldens "did knowingly [conspire] with one another, to commit money laundering offenses." As such, it omitted an allegation commonly made in such charges, that the defendants conspired "with others known and unknown to the Grand Jury."[24] The Boldens contend that, because such an allegation was not made in Count Thirty-Seven, the jury was obliged to find that the Boldens had conspired *with each other*, and the court erred in failing to properly instruct the jury on this point.[25]

A defendant may only be tried on charges alleged in an indictment, and only "the grand jury may broaden or alter the charges in the indictment." *United States v. Randall*, 171 F.3d 195, 203 (4th Cir. 1999) (internal quotation and citation omitted). An indictment is constructively amended "when the essential elements of the offense . . .

---

[24]At oral argument, the Assistant United States Attorney acknowledged that the failure to allege "others known and unknown" in the indictment was a drafting error.

[25]The instruction which the Boldens challenge stated in pertinent part:

> In order for you to find either Defendant — either of the Defendants or both guilty of the charge [of money laundering conspiracy], the Government must prove each of the following essential elements beyond a reasonable doubt as to the Defendant under consideration: *one, two or more persons* in some way or manner, positively or tacitly, *came to a mutual understanding* to try to accomplish a common and unlawful plan.

(emphasis added). In contrast, the Boldens' proposed instruction provided that, in order to convict, the jury had to find "that defendants Glennis Bolden and [Clifford] Bolden made an agreement to commit money laundering offenses." Although the available record does not show whether the Boldens objected to the instruction given, we assume that a proper objection was made and that this contention has not been waived.

are altered to broaden the possible bases for conviction beyond what is contained in the indictment." *United States v. Keller*, 916 F.2d 628, 634 (11th Cir. 1990); *see also United States v. Floresca*, 38 F.3d 706, 710 (4th Cir. 1994) ("A constructive amendment to an indictment occurs when either the government, [the court], or both, broadens the possible bases for conviction beyond those presented by the grand jury."). Where an indictment has been constructively amended, we have found reversible error, and we "conclusively presume that the defendant has been prejudiced by the constructive amendment." *Floresca*, 38 F.3d at 711.

In support of their constructive amendment claim, the Boldens rely almost exclusively on the Eleventh Circuit's decision in *Keller*, 916 F.2d 628, where two defendants were indicted for conspiracy, and the indictment failed to allege that there were unnamed coconspirators. An initial instruction permitted the jury to convict Keller if the jury found he had conspired with anyone, while the indictment, like our Count Thirty-Seven, alleged that he had conspired only with his code-fendant. The court gave a supplemental instruction, using a hypothetical conspiracy example, emphasizing that Keller could be convicted if the jury found he entered into an unlawful agreement with *anyone*. The jury then convicted Keller and acquitted his codefendant. The Eleventh Circuit ruled that, where an indictment alleges "that only two individuals conspired, . . . an essential element of the offense is the identity of the individuals who agreed." *Id.* at 634. The court observed that, "[w]hile the initial instruction standing alone may not have been enough to constitute an amendment, the trial court exacerbated the problem with its supplemental instructions in response to the jury's question." *Id.* at 636.

Contrary to the Boldens' contention, the instruction did not fatally amend Count Thirty-Seven. Even if a coconspirator's identity is an essential element of the conspiracy charge (*but see United States v. Am. Waste Fibers Co., Inc.*, 809 F.2d 1044, 1046 (4th Cir. 1987)), the jury, by convicting the Boldens of the money laundering conspiracy alleged, necessarily found that they had conspired with each other, as Count Thirty-Seven alleged, and as the instruction permitted.[26]

---

[26]Even if the jury found that there were additional coconspirators, such as Nelson and Lane, it also found, as the instruction permitted, that the Boldens conspired with each other.

3.

Finally, the Boldens contend that the evidence was insufficient to support their convictions for money laundering conspiracy. On this issue, they first assert that the Industrial Check Transactions cannot be part of a money laundering conspiracy because they did not involve the "proceeds" of the specified unlawful activity. Independently, the Boldens contend that, even if the Industrial Check Transactions involved those proceeds, the transactions were not for the purpose of promoting or concealing the specified unlawful activity. As explained in Part III.B, *supra*, these contentions are without merit. The Boldens also maintain that the overt acts in Count One, incorporated and realleged in Count Thirty-Seven, do not involve money laundering conduct and that the evidence was therefore insufficient to convict. On the contrary, as we explained in Part III.C.1.a, *supra*, an indictment for money laundering conspiracy need not allege an overt act. In these circumstances, this contention must also be rejected.

D.   *The False Claims Evidence*

Ms. Bolden challenges eighteen of her twenty convictions for violating the false claims statute (Counts Three through Eleven, Thirteen through Nineteen, Twenty-One, and Twenty-Four).[27] She contends that the evidence was insufficient on the essential element of her "knowledge" that the claims submitted to Medicaid were false. Her convictions resulted from eighteen separate Medicaid Bills, between December 1993 and April 1995, for Emerald Health's supposed care of patients who had died, had been hospitalized, or had been discharged.

The false claims statute, codified at § 287 of Title 18, criminalizes the submission of a false claim to the United States, or any department or agency thereof, if the defendant *knows* that such claim is

---

[27]Ms. Bolden was convicted on 20 counts of filing false claims. Two of those counts related to her submission of false Cost Reports to Medicaid, while the other 18 counts were connected to her submission of Medicaid Bills for patient services not rendered. Ms. Bolden only appeals her convictions on the latter 18 counts. When we refer to her false claims convictions, we are referring to those on appeal.

"false, fictitious, or fraudulent."[28] Thus, we must uphold such a conviction if the evidence shows the submission of a false claim and if the defendant "acted with knowledge that the claim was false . . . and with a consciousness that he was either doing something which was wrong, or which violated the law." *United States v. Maher*, 582 F.2d 842, 847 (4th Cir. 1978) (internal citations omitted); *see also United States v. Blecker*, 657 F.2d 629, 634 (4th Cir. 1981) (upholding false claim conviction even though there was "evidence that the government got its money's worth").

Although the jury was required to find, in order to convict Ms. Bolden, that she had *knowingly* submitted the eighteen false claims to Medicaid, it was entitled to do so on the basis of circumstantial evidence. Indeed, "[t]he question of one's intent is not measured by a psychic reading of [the defendant's] mind but by the surrounding facts and circumstances; i.e., circumstantial evidence." *United States v. Larson*, 581 F.2d 664, 667 (7th Cir. 1978). On the evidence presented, the jury could conclude that Ms. Bolden "knowingly" submitted the eighteen false claims to Medicaid. She controlled Emerald Health's Medicaid Bills, and Emerald Health was strapped for funds. Ms. Bolden was aware that Emerald Health's patient census was incorrect, and she nonetheless instructed Emerald Health's employees to submit the Medicaid Bills.[29] According to Ms. Cox, the accounts

---

[28]The false claims statute, 18 U.S.C. § 287, provides in pertinent part that:

> Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, *knowing* such claim to be false, fictitious, or fraudulent, shall be imprisoned not more than five years and shall be subject to a fine in the amount provided in this title.

18 U.S.C. § 287 (emphasis added). Importantly, the submission of a false claim to a state agency to obtain federal funds that were provided to the state falls within the parameters of § 287. *See United States v. Littlefield*, 840 F.2d 143, 151 (1st Cir. 1988) (submission of false claims to state agency violated § 287 because federal monies were used to fund state program).

[29]In order to bill Medicaid, Emerald Health maintained a daily "patient census," which identified patients residing in the nursing facility and specified the levels of care they were receiving.

receivable clerk, "many times [Emerald Health] would get behind on the census" and "most of the time [they] would go ahead and . . . submit a bill to Medicaid." Ms. Cox informed Ms. Bolden that Emerald Health's patient census was inaccurate, yet Ms. Bolden instructed her to go ahead and bill Medicaid because it was necessary "to get money into the facility," and Emerald Health could, in any event, "send in a recoupment if [it] billed something in error." Even if Ms. Bolden had contemplated correcting these Medicaid Bills, such an effort would not have been a valid defense to the charges. Under § 287, the Government was obliged to establish only her *knowing* submission of the false claims. The jury was entitled to conclude, on the evidence of Ms. Cox and the related circumstances, that Ms. Bolden knowingly submitted false claims to Medicaid. *See United States v. Adamson*, 700 F.2d 953, 962 (5th Cir. 1983) ("Where sufficiency is at issue, a finding that an accused acted recklessly may be enough to sustain a jury verdict, because a jury may properly *infer* the requisite intent." (emphasis in original)); *United States v. Cincotta*, 689 F.2d 238, 242 (1st Cir. 1982) (concluding that evidence of defendant's pervasive involvement in operations of corporation involved in transactions in question was sufficient "for a reasonable juror to infer that [defendant] knew of . . . the conspiracy").

Ms. Bolden also contends that her submission of false claims to Medicaid were simply mistakes, due to poor bookkeeping and accounting practices. She presented this explanation to the jury as a defense, however, and it was rejected. Viewed in the proper light, there was sufficient evidence for the jury to convict Ms. Bolden on each of the false claim charges.

## IV. *THE SENTENCING ISSUES*

Having resolved the issues related to the Boldens' convictions, we turn to their sentences. In that respect, they first contend that the court erred in grouping their fraud and money laundering offenses. They then assert that the sentencing court failed to comply with Rule 32(c)(1) of the Federal Rules of Criminal Procedure. Finally, they maintain that, if the court made adequate findings under Rule 32(c)(1), it erred in its calculation of fraud losses, and in its application of adjustments to Ms. Bolden for offenses involving "abuse of position of trust" and "vulnerable victim[s]."

### A.  *The Standards of Review*

In assessing challenges to a sentencing court's application of the Guidelines, we review factual determinations for clear error and legal issues de novo. *United States v. Singh*, 54 F.3d 1182, 1190 (4th Cir. 1995). The grouping of multiple convictions, pursuant to U.S.S.G. § 3D1.2, "involves a legal interpretation of guidelines terminology, [and] we review [grouping issues] de novo." *United States v. Toler*, 901 F.2d 399, 402 (4th Cir. 1990). A sentencing court's factual findings in its application of the Guidelines, made under Rule 32(c)(1), are reviewed for clear error. *United States v. Souther*, 221 F.3d 626, 632 (4th Cir. 2000). When a sentencing court has failed to resolve a disputed fact on which it relied at sentencing, we remand for resentencing. *United States v. Morgan*, 942 F.2d 243, 245 (4th Cir. 1991). A finding of fraud loss is a factual issue, which we review for clear error. *United States v. Godwin*, 272 F.3d 659, 671 (4th Cir. 2001). Finally, whether a defendant occupies a position of trust is a factual determination reviewable for clear error. *United States v. Glymph*, 96 F.3d 722, 727 (4th Cir. 1996).

### B.  *The Grouping Issue*

The Boldens contend that the sentencing court erroneously grouped their fraud and money laundering convictions. Pursuant to U.S.S.G. § 3D1.2(d) of the Guidelines, all "counts involving substantially the same harm shall be grouped together into a single group." In construing § 3D1.2(d), we have concluded that fraud and money laundering offenses should only be grouped when they are "'closely related.'" *United States v. Walker*, 112 F.3d 163, 167 (4th Cir. 1997) (quoting *United States v. Porter*, 909 F.2d 789, 792-93 (4th Cir. 1990)). According to the Boldens, their fraud and money laundering offenses are not so closely related as to warrant grouping. We disagree.

In *Porter*, we first considered whether fraud and money laundering may be so closely related as to warrant being "grouped together." 909 F.2d 789. Porter had obtained the proceeds of an illegal gambling operation and laundered those proceeds by purchasing a home. We declined to group his offenses because the money laundering was not "in any way integrated" with the fraud scheme, i.e., the gambling operation. *Id.* at 793. The only connection between the gambling

operation and his money laundering activity was that Porter had laundered the proceeds of the scheme. We concluded that, in such a situation, the fraud and money laundering offenses were not so "closely related" as to justify grouping. *Id.* We observed, however, that the grouping of such offenses would be appropriate where an enterprise generated monies through illegal activities and "simultaneously laundered those monies as part of the same continuing transaction or common scheme." *Id.* In *Walker*, we approved the grouping of fraud and promotion money laundering offenses because the money laundering activities were an essential aspect of the fraud scheme. 112 F.3d at 167. Walker, an insurance salesman, had diverted funds from his customers to his personal use and made fictitious interest payments to his customers with the proceeds. In so doing, he both concealed and promoted the fraud scheme. In making the fictitious interest payments, he used the proceeds of his fraud scheme to avoid suspicion that fraudulent activity was afoot and to encourage customers to continue paying their premiums. *Id.*

The *Walker* principles are applicable here. The Boldens were found to have engaged in both promotion and concealment money laundering, and the Industrial Check Transactions not only concealed the Related Party Transactions from Medicaid, they promoted those transactions as an essential component of the fraud scheme. By obtaining funds from the Industrial Check Transactions, the Boldens were able to provide Emerald Health with a portion of the supplies reflected on the Industrial invoices. These actions gave an aura of legitimacy to their criminal endeavor and enabled their scheme to continue. As such, the money laundering and the Related Party Transactions were not only closely related, they were inextricably intertwined. In every aspect of the fraud scheme, the Boldens' goal was the same: the improper extraction of monies from Medicaid. Their money laundering activities were essential to achieving that goal, and their money laundering and fraud activities were part of a continuous, common scheme to defraud Medicaid. Thus, the fraud and money laundering offenses are "closely related" and, in the context of the Guidelines, were properly "grouped together" by the sentencing court.[30]

[30]Ms. Bolden also contends that grouping is inappropriate here because the sum of money laundered (approximately $50,000) was small in com-

*See United States v. Emerson*, 128 F.3d 557, 566 (7th Cir. 1997) (approving grouping when defendant had "embarked upon his money laundering scheme with the intent of promoting his mail fraud swindle"); *United States v. Landerman*, 167 F.3d 895 (5th Cir. 1999) (upholding grouping when money laundering was used to promote and enhance fraud scheme). In these circumstances, the contention that the court erred on the grouping issue must be rejected.

### C.  *The Rule 32 Issues*

The Boldens next contend that their sentences should be vacated because the court failed to comply with Rule 32(c)(1).[31] Specifically, they assert that the court failed to make adequate factual findings on the issues in dispute. In a sentencing hearing, the court, under Rule 32(c)(1), is to "rule on any unresolved objections to the [PSR]." On controverted matters, the court is to make either "a finding on the allegation or a determination that no finding is necessary." Pursuant to Rule 32(b)(6)(D), the sentencing court may, once objections are resolved, "accept the [PSR] as its findings of fact."

A sentencing court's findings on controverted matters ensure a record "as to how the district court ruled on any alleged inaccuracy

---

parison to the losses attributable to the overall fraud scheme (approximately $700,000). This contention, however, is also without merit. *See Walker*, 112 F.3d at 166 (permitting grouping of fraud and money laundering offenses even though Walker had laundered only $5,000 of $850,000 that his scheme had produced).

[31]Rule 32(c)(1) of the Federal Rules of Criminal Procedure provides, in relevant part:

> (1)  *Sentencing Hearing*. At the sentencing hearing, the court must afford counsel . . . an opportunity to comment on the probation officer's determinations and on other matters relating to the appropriate sentence, and must rule on any unresolved objections to the [PSR] . . . . For each matter controverted, the court must make either a finding on the allegation or a determination that no finding is necessary because the controverted matter will not be taken into account in, or will not affect, sentencing.

Fed. R. Crim. P. 32(c)(1).

in the PSR [and] allow[s] effective appellate review of the sentence imposed." *United States v. Walker*, 29 F.3d 908, 911 (4th Cir. 1994). We have concluded, however, that the "court need not articulate [findings] as to disputed factual allegations with minute specificity." *United States v. Perrera*, 842 F.2d 73, 76 (4th Cir. 1988). In fact, the court may simply adopt the findings contained in a PSR, provided that it makes clear "which disputed issues were resolved by its adoption." *Walker*, 29 F.3d at 911 (citing *United States v. Morgan*, 942 F.2d 243, 245 (4th Cir. 1991)). In the Boldens' sentencing hearings, the court satisfied Rule 32 on nearly all factual disputes. Two of those matters, however, warrant further scrutiny from the Rule 32(c)(1) standpoint: (1) Mr. Bolden's fraud loss calculation and (2) Ms. Bolden's "vulnerable victim" adjustment.

1.

At Mr. Bolden's sentencing hearing on Oct. 7, 1999, the court first ruled on several of his objections. It then stated: "[Mr. Bolden's] remaining objections are overruled; and the Court determines that the [PSR] is fully supported by the evidence and the government's filing is correct and adopted by the Court." Although the adoption of Mr. Bolden's PSR is sufficient to permit review of his sentence in most respects, it is insufficient on whether the Lease Transactions were properly included in his fraud loss calculation. Neither the PSR nor the "government's filing," i.e., the Government's Sentencing Memorandum, contained factual assertions sufficient to justify inclusion of the Lease Transactions in that calculation.[32] Mr. Bolden unsuccess-

---

[32]Mr. Bolden also asserts that the sentencing court erred in including the Fictitious Invoices and the Backdated Invoices in his fraud loss calculation. These assertions are meritless. Mr. Bolden was aware of the conduct involved in the Related Party Transactions. In fact, as his PSR noted, he established the amounts and products that Nelson included on the Industrial invoices to Emerald Health. In so doing, he knew that Emerald Health would be charged for products it would not receive. He also knew that his wife controlled the timing of the invoices, and that she was responsible for manipulating the Medicaid reimbursement system. Thus, the sentencing court properly found that he participated in Emerald Health's submission of the Fictitious Invoices and the Backdated Invoices to Medicaid, and it did not err in including those invoices in his fraud loss calculation.

fully sought to exclude approximately $82,000 (attributable to the Lease Transactions) from his fraud loss calculation. He contends that the court failed to find that he directly participated in the Lease Transactions or that those transactions were in furtherance of jointly undertaken criminal activity.

In calculating fraud loss, a sentencing court must first apply the principles of "relevant conduct." *See* U.S.S.G. § 1B1.3. Pursuant thereto, specific offense characteristics, such as the fraud loss properly attributable to a defendant, must be determined on the basis of (1) the acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by a defendant; and (2) in the case of a jointly undertaken criminal activity, all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity. U.S.S.G. § 1B1.3(a)(1)(A)–(B).

The fact that Mr. Bolden was convicted of conspiracy to commit mail and wire fraud, which included the Lease Transactions, does not necessarily mandate a finding that the losses from those transactions constitute relevant conduct attributable to him. Notwithstanding the verdict, the court was obliged to make individualized findings on fraud loss. As the Court of Appeals for the District of Columbia has observed:

> A jury verdict convicting the defendants of participation in a single conspiracy does not obviate the need for . . . individualized findings by the sentencing court. Such a verdict speaks to the scope of the defendant's agreement only in very general terms: It does not address the question of which specific actions demonstrated at trial were in furtherance of that single conspiracy or were foreseeable to the conspirators.

*United States v. Childress*, 58 F.3d 693, 722 (D.C. Cir. 1995). And as Judge Wilkins has aptly put it: "One participant in a multi-participant . . . conspiracy may be held accountable, for sentencing purposes, for a greater or lesser [amount] than other coparticipants." *United States v. Gilliam*, 987 F.2d 1009, 1013 (4th Cir. 1993) (discussing commentary to U.S.S.G. § 1B1.3(a)(1)).

a.

Mr. Bolden's PSR fails to support a finding that he directly partici-pated in all seven Lease Transactions. The only connection made in the PSR between Mr. Bolden and the Lease Transactions is a single 1993 lease. According to the PSR, the "actual purpose" of this lease "was to finance the purchase of a 'blue' $53,000 car for Clifford Bol-den." This fact, standing alone, fails to warrant a finding that all the losses from the Lease Transactions are attributable to Mr. Bolden. In its Sentencing Memorandum, the Government asserted that Mr. Bol-den was also directly connected to a second lease. It asserted that he had attended a seminar in New York with respect to this second lease, and that he co-signed an Emerald Health check making a payment on it. While the court adopted the Sentencing Memorandum, the asser-tions made therein also fail to support the finding that Mr. Bolden is accountable for all the losses arising from the seven Lease Transac-tions.

b.

In further support of the fraud loss calculation on Mr. Bolden, the Government contends that the losses arising from the Lease Transac-tions were appropriately includable under the second prong of § 1B1.3(a)(1), i.e., that they were reasonably foreseeable and "in fur-therance of the jointly undertaken criminal activity." The commentary to § 1B1.3 provides guidance on this point, observing that the scope of a defendant's criminal activity "is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not nec-essarily the same for every participant." U.S.S.G. § 1B1.3, cmt. n. 2. As such, a sentencing court, in applying § 1B1.3, must first determine the scope of the criminal activity a defendant "agreed to jointly under-take (*i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement*)." *Id.* (emphasis added).

The commentary to § 1B1.3 also provides that, "[i]n determining the scope of the criminal activity that the particular defendant agreed to jointly undertake, . . . the court may consider any explicit agree-ment or implicit agreement fairly inferred from the conduct of the defendant and others." *Id.* The commentary points out, however, that "the fact that the defendant is aware of the scope of the overall opera-

tion is not enough to hold him accountable for the activities of the whole operation." *United States v. Studley*, 47 F.3d 569, 575 (2d Cir. 1995). Instead, a sentencing court must assess and determine the "role the defendant agreed to play in the operation." *Id.*

In light of the commentary to § 1B1.3, several circuits require a sentencing court to "make *particularized* findings with respect to both the scope of the defendant's agreement *and* the foreseeability of his co-conspirators' conduct before holding the defendant accountable for the scope of the entire conspiracy." *United States v. Campbell*, 279 F.3d 392, 400 (6th Cir. 2002) (emphasis in original); *see also Studley*, 47 F.3d at 574 (concluding that sentencing court must make particularized findings as to "scope of the criminal activity agreed upon by the defendant" and "whether the activity was foreseeable to the defendant"); *United States v. Bush*, 28 F.3d 1084, 1087 (11th Cir. 1994) (requiring individualized findings concerning scope of criminal activity undertaken by defendant and whether activity was reasonably foreseeable to defendant); *United States v. Evbuomwan*, 992 F.2d 70, 72-74 (5th Cir. 1993) (same). We agree with our sister circuits that a sentencing court, in order to hold a defendant accountable for the conduct of his coconspirators, should make particularized findings with respect to both prongs of § 1B1.3(a)(1)(B). As to Mr. Bolden, however, neither the PSR nor the Sentencing Memorandum — nor the court — made findings on (1) the scope of the criminal activity he agreed to jointly undertake, or (2) whether all the Lease Transactions were reasonably foreseeable.[33] As such, his fraud loss findings are inadequate.[34]

---

[33]There was substantial evidence connecting Mr. Bolden to certain aspects of the fraud scheme, particularly the Related Party Transactions. His connection to the Lease Transactions, however, may be tenuous. For example, Nelson testified that he never spoke with Mr. Bolden regarding the Lease Transactions and that, to his knowledge, Mr. Bolden had no involvement in them.

[34]Because the findings on inclusion of the Lease Transactions in Mr. Bolden's fraud loss are inadequate, we do not reach the merits of his challenge on this issue.

2.

Ms. Bolden contends that the sentencing court failed to make adequate factual findings on her sentencing adjustment based on "vulnerable victim," pursuant to U.S.S.G. § 3A1.1. In ruling on Ms. Bolden's objection on this point, the court stated that "[t]he defendant's objection to the vulnerable victim two-level enhancement is overruled." After sustaining her objections to adjustments for "sophisticated concealment" and "role in the offense," the court found "that the [PSR] was correct in all other respects and [was] fully supported by the supporting affidavits filed by the government."

Ms. Bolden asserts that the PSR's recommendation of the vulnerable victim adjustment "rested on a legally erroneous interpretation of the terms 'victim' and 'vulnerable,' . . . and that the PSR failed to apply the 'targeting' requirement," as necessitated by the 1994 Guidelines. In recommending the vulnerable victim adjustment, the PSR relied on the 1994 Guidelines, which provide for such an adjustment "[i]f the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1. The PSR, in recommending the adjustment, stated that "[t]he investigation revealed information from various sources that residents received inadequate care, due in part to the lack of adequate staff at the long term care nursing home facility."

In order to apply the vulnerable victim adjustment, a sentencing court must identify the victims of the offense, based not only on the offense of conviction, but on all relevant conduct. *United States v. Blake*, 81 F.3d 498, 503-04 (4th Cir. 1996) ("We therefore reject [the defendant's] argument that, for the purpose of § 3A1.1, 'a victim of the offense' is only an individual considered a victim of the specific offense of conviction."). Accordingly, the residents of Emerald Health would be "victims" of the fraud scheme if Ms. Bolden failed to provide them with adequate care as a result of the scheme.

Under the 1994 Guidelines, we utilize a two-part test for assessing the applicability of the vulnerable victim adjustment. First, the victim must be "unusually vulnerable," *United States v. Holmes*, 60 F.3d 1134, 1135 (4th Cir. 1995), and second, "the victim must also have

been targeted by the defendant because of the victim's unusual vulnerability."[35] *Id.*; *see also* U.S.S.G. § 3A1.1, cmt. n.1 (1994) ("This adjustment applies . . . where an unusually vulnerable victim is made a target of criminal activity by the defendant."). It is insufficient for a sentencing court to find only that a victim is elderly or physically infirm, it must also determine that "the victim's vulnerability or susceptibility facilitated the defendant's crime in some manner." *United States v. Monostra*, 125 F.3d 183, 190 (3d Cir. 1997). While it is indisputable that the residents of Emerald Health were elderly, and many of them likely suffered from both mental and physical ailments, neither the sentencing court nor the PSR found the vulnerability of Emerald Health's residents to have facilitated Ms. Bolden's offenses. The court also did not find that Emerald Health's residents were targeted because of their unusual vulnerability. *United States v. Gary*, 18 F.3d 1123, 1128 (4th Cir. 1994) (ruling that, before applying vulnerable victim adjustment, a sentencing court first must find that defendant "initially chose[ ] his victim because of her particular vulnerability"). In these circumstances, we vacate this aspect of Ms. Bolden's sentence.[36]

---

[35]In 1995, the Sentencing Commission adopted Amendment 521, rendering it unnecessary for a sentencing court to find that a defendant had specifically targeted his victim. In adopting Ms. Bolden's PSR, however, the court applied the 1994 Guidelines, which, under our precedent, require the sentencing court to find that the defendant targeted his victim. *See Holmes*, 60 F.3d at 1135. On appeal, the Government contends that targeting is not required under the 1994 Guidelines because the 1995 amendment simply "clarified" that, even under the 1994 Guidelines, U.S.S.G. § 3A1.1 did not require targeting. In this Circuit, this "clarification" is more appropriately an "alteration" because our precedent under the 1994 Guidelines required the Government to demonstrate targeting. Consequently, the targeting requirement of the 1994 Guidelines must be applied to Ms. Bolden in order to avoid Ex Post Facto issues. *See United States v. Stover*, 93 F.3d 1379, 1386 (8th Cir. 1996).

[36]Because the sentencing court made inadequate factual findings on the application of the "vulnerable victim" adjustment to Ms. Bolden's offense level, we do not reach the merits of her challenge on this issue.

### D.   *The Fraud Loss Calculation (Ms. Bolden)*

Ms. Bolden next contends that the court clearly erred in calculating her fraud loss. Pursuant to § 2F1.1(b)(1) of the 1994 Guidelines, a sentencing court is obliged to increase, on a graduated basis, the offense level of a defendant convicted of fraud, depending on the amount of loss resulting from the fraud scheme. Ms. Bolden challenges the inclusion in her fraud loss of: (1) her salary and that of a physician assistant, (2) the Aequitron Invoices, and (3) costs included on the Cost Reports for which supporting invoices could not be found.

1.

Ms. Bolden first maintains that the court erred in including her salary and the salary of a physician assistant, Frank Dickerson, in her fraud loss calculation. She contends that Dickerson's salary was a proper "direct cost" of Emerald Health and, in the alternative, that there is no evidence connecting her to the improper classification of his salary or showing that the misclassification was deliberate.[37] At trial, a Medicaid investigator and a Medicaid auditor each testified that only those salaries directly related to patient care are proper direct costs on the Cost Reports. Thus, administrative salaries, such as Ms. Bolden's, are reportable on the Cost Reports only as indirect costs. Additionally, the compensation of physicians and physician assistants are separately reimbursed by Medicaid and are not includable on the Cost Reports. According to the Medicaid auditor, a physician assistant, such as Dickerson, should have "bill[ed] the Medicaid program directly." As such, the court did not err in deciding that Dickerson's salary was an improper direct cost on the 1993 and 1994 Cost Reports.

There was also an ample basis for the court's findings that Ms. Bolden was responsible for the misclassification of Dickerson's salary and that the misclassification was deliberate. First, she was responsible for the management of Emerald Health, including classification of

---

[37]As pointed out earlier, *supra* Part II.A, unlike with "indirect costs," where each facility receives a flat rate per Medicaid patient, Medicaid reimburses nursing facilities for the actual amount spent on "direct costs," i.e., patient-related expenses.

its expenses and preparation of the Cost Reports. Emerald Health also listed Dickerson on those Reports as its Director of Nursing, rather than as a physician assistant, to conceal the misclassification of his salary as a direct cost. Finally, there was evidence that Ms. Bolden was responsible for the misclassification of other employees' salaries, thus permitting the sentencing court to infer that she was responsible for the improper classification of Dickerson's salary.[38] In these circumstances, the court did not err by including Dickerson's misclassified salary in Ms. Bolden's fraud loss calculation.

Ms. Bolden also challenges the inclusion of her own salary in her fraud loss calculation. She contends that, although she performed administrative duties as Emerald Health's Director of Operations, she also served as Supervisor of its Ventilator Unit. Moreover, because the salary of this Supervisor is properly a direct cost, she asserts that her full salary was not includable in her fraud loss calculation. In support of this contention, Ms. Bolden relies on the testimony of Emerald Health's former Medicaid auditor, who testified that the job description of the Supervisor "would support an argument" that the portion of her salary for that position was properly a direct cost. However, Ms. Bolden offered no evidence that her *actual* duties in the Ventilator Unit involved any direct patient care. Indeed, according to the Medicaid investigator, absent a study to ascertain how much time Ms. Bolden dedicated to administrative work compared to how much she spent on direct patient care, it was improper to classify *any portion* of her salary as a direct cost.

Significantly, the reclassification of Ms. Bolden's salary occurred

---

[38]For example, Ms. Bolden was responsible for the mis-classification of the salary of Lori Gann, who held an administrative position in the business office, as a direct cost on the 1993 and 1994 Cost Reports. In March of 1994, while preparing the 1993 Cost Report, Ms. Bolden reclassified Gann as a medical records clerk, although her duties at Emerald Health remained unchanged. Unlike an administrative position, the salary of a medical records clerk is properly included as a direct cost. Ms. Bolden then gave Gann two name tags — one for the business office and one that identified her as a medical records clerk — and told Gann to "wear the Medical Records name tag whenever State employees [are] in the facility."

in March of 1994, when she was preparing the 1993 Cost Report and attempting to find ways to avoid another large repayment to Medicaid.[39] In these circumstances, it was entirely proper to include Ms. Bolden's entire salary in her fraud loss calculation.

2.

Ms. Bolden also maintains that the sentencing court miscalculated her fraud loss by including nearly $200,000 attributable to Emerald Health's transactions with Aequitron. This sum resulted from the triple-expensing of a $64,000 Aequitron invoice originally issued for a ventilator equipment purchase. The court included the triple-expensing in Ms. Bolden's fraud loss calculation, and she contends it did so erroneously.[40]

Ms. Bolden asserts that the triple-expensing of the Aequitron invoice was simply an accounting error. She also maintains that, even if it was fraudulent, there is no direct evidence tying her to it. In the absence of direct evidence, however, there was ample circumstantial evidence justifying the court's finding that it was a fraudulent act rather than a mistake. Importantly, there was evidence tying Ms. Bolden to the duplication of other Aequitron invoices. In addition, she knew how the Medicaid cost reporting system operated, she controlled Emerald Health's finances, she possessed the authority to classify expenses, and she was motivated to avoid another significant Emerald Health repayment to Medicaid. As such, the court did not err in including the triple-expensed Aequitron invoice in Ms. Bolden's fraud loss calculation.

---

[39]From 1990 through 1992, Emerald Health's actual direct patient-related costs were substantially less than the prospective direct cost payments it received from Medicaid. Accordingly, Emerald Health was required to reimburse Medicaid the respective sums of $138,687, $102,501, and $318,695, for those years.

[40]The $64,000 Aequitron purchase was actually entered six times on Emerald Health's accounting ledger. Three of those entries, however, were subsequently corrected, leaving three entries on the ledger and on the 1994 Cost Report.

3.

Ms. Bolden's final contention on her fraud loss calculation relates to the inclusion of approximately $170,000 in costs billed to Medicaid by Emerald Health for which vendors' invoices could not be located (the "Missing Invoice Costs"). She asserts that the Government failed to establish by a preponderance of the evidence that the Missing Invoice Costs were fraudulent. *See United States v. Harris*, 882 F.2d 902, 907 (4th Cir. 1989). As explained below, the sentencing court erred in its inclusion of the Missing Invoice Costs in Ms. Bolden's fraud loss calculation.

During the investigation of Emerald Health, the Medicaid investigator conducted an extensive audit, comparing the costs specified on the Cost Reports with those listed on Emerald Health's cash disbursement journal, its bank records, and its invoices from service and supply companies. Even though the cash disbursement journal and the bank records were supportive of the Cost Reports, the investigator concluded that the Missing Invoice Costs were fraudulent because he could not find supporting invoices for them. The Missing Invoice Costs were accordingly included in the PSR's fraud loss calculation for Ms. Bolden.

Prior to the sentencing hearing, Ms. Bolden objected to the inclusion of the Missing Invoice Costs in her fraud loss calculation, asserting that they were treated as fictitious even though Emerald Health's cash disbursement journal and bank records reflected those costs as having been paid to more than twenty vendors. The Government made no effort to contact the vendors to verify its position on the Missing Invoice Costs, and Ms. Bolden filed affidavits from several of the vendors, indicating that at least part of those costs were valid. She also produced an affidavit of a former Emerald Health employee, indicating that he had ordered supplies from certain of the vendors during 1993 and 1994. At trial, the Medicaid investigator acknowledged that the bank records in connection with the Missing Invoice Costs appeared to be accurate. Finally, Ms. Bolden contended that, although the invoices relating to the Missing Invoice Costs had been misplaced, they were legitimate. Indeed, several Emerald Health employees testified at trial that Emerald Health's business operations were disorganized and subject to poor bookkeeping.

In response, the Government did not dispute Ms. Bolden's affidavits, and it acknowledged in its Sentencing Memorandum that "the evidence connecting [Ms. Bolden] to the fraudulent overstatement of [the Missing Invoice Costs] is less than compelling." It failed to produce any testimony that the Missing Invoice Costs were fraudulent, and its primary position was that Ms. Bolden had the motive and (as Emerald Health's Director of Operations) the opportunity to fabricate those costs. At the sentencing hearing, the Government asserted that the issue on the Missing Invoice Costs was for "the Court to decide based on the facts and circumstances." It chose not to make any further argument on the issue, and the court overruled Ms. Bolden's objection.

In sum, the Government's evidence on the Missing Invoice Costs consisted of the opinion of a single witness, who admitted that the documentation underlying those costs appeared to be legitimate. It failed to produce further evidence, and it admitted that its evidence on this issue was "less than compelling." Ms. Bolden, on the other hand, came forward with an explanation of why the Missing Invoice Costs were legitimate, and she produced affidavits corroborating, to some extent, her position. In these circumstances, we conclude that the court erred in including those costs in Ms. Bolden's fraud loss.

### E.   *Abuse of Position of Trust (Ms. Bolden)*

Finally, Ms. Bolden contends that the sentencing court erred in applying the "abuse of position of trust" adjustment (the "Trust adjustment") to her sentence. She asserts that, although she may have occupied a position of trust with Emerald Health, she held no such position with respect to Medicaid, and the court erred in applying the Trust adjustment to her. Pursuant to U.S.S.G. § 3B1.3, an adjustment in the base offense level is authorized "[i]f the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. The commentary to § 3B1.3 explains that a position of trust is "characterized by professional or managerial discretion," and points out that the Trust adjustment applies where "the position of trust . . . contributed in some significant way to facilitating the commission or concealment of the offense." U.S.S.G. § 3B1.3, cmt. n. 1.

We have observed that "'the question of whether an individual occupies a position of trust should be addressed from the perspective of the victim.'" *United States v. Moore*, 29 F.3d 175, 179-80 (4th Cir. 1994) (quoting *United States v. Queen*, 4 F.3d 925, 929 (10th Cir. 1993)). In order to apply the Trust adjustment to Ms. Bolden, the sentencing court was obliged to first identify the victims of her fraudulent activities. And in this case, the victims were Medicaid and the American taxpayers. *See United States v. Adam*, 70 F.3d 776, 782 (4th Cir. 1995) (concluding that victims of Medicaid fraud were "the American taxpayers"). As such, the court could apply the Trust adjustment to Ms. Bolden only if she occupied a position of trust as to Medicaid.

The PSR addressed Ms. Bolden's position of trust only as to Emerald Health. In its Sentencing Memorandum, however, and at the sentencing hearing, the Government maintained that she occupied a fiduciary relationship as to Medicaid, which she abused in committing and concealing the fraud scheme. It took the position that, because of Ms. Bolden's relationship to Medicaid, the Trust adjustment should be applied to her. The court overruled Ms. Bolden's objection to the Trust adjustment, and it adopted the remaining portions of her PSR. Thus, the court implicitly adopted the Government's position that Ms. Bolden occupied a trust relationship as to Medicaid.

Ms. Bolden maintains that the court erred in finding that she occupied a position of trust as to Medicaid, asserting that Medicaid conferred no discretionary authority on her. As Director of Operations of Emerald Health, however, she possessed substantial discretionary authority. Medicaid entrusted Ms. Bolden with thousands of dollars in prospective payments to Emerald Health, that were to be used for the benefit of its Medicaid beneficiaries. And her abuse of that authority contributed significantly to the commission and concealment of the fraud scheme.

We have upheld application of the Trust adjustment in situations where physicians have defrauded Medicaid. *See Adam*, 70 F.3d at 782. In *Adam*, the adjustment was found appropriate for a physician involved in Medicaid fraud because such activity "is terribly difficult to detect because physicians exercise enormous discretion." *Id.*; *see also United States v. Hoogenboom*, 209 F.3d 665, 671 (7th Cir. 2000)

("Medical service providers occupy positions of trust with respect to private or public insurers (such as Medicare) within the meaning of guideline § 3B1.3."). Compellingly, the Second Circuit, in *United States v. Wright*, 160 F.3d 905, 910-11 (2d Cir. 1998), has upheld application of the Trust adjustment in similar circumstances. In *Wright*, the defendants had embezzled funds from a Medicaid-funded residence facility. The court observed that public funds were entrusted to the facility, for the benefit of its patients, and the defendants, through their positions at the facility, had embezzled the funds "without fear of timely detection by . . . the government, who entrusted them with the funds." *Id.* at 911. The court concluded that application of the Trust adjustment was appropriate in such a situation, when "viewed from the standpoint of the governmental agencies that entrusted the funds to [the facility's] management to use them properly for the well-being of the intended beneficiaries."[41] *Id.* As in *Wright*, Ms. Bolden, through her position at Emerald Health, was entrusted by Medicaid with its funds, and she abused the trust placed in her. Thus, the court did not err in finding that Ms. Bolden occupied a position of trust with respect to Medicaid, and we affirm its application of the Trust adjustment.

V.

Pursuant to the foregoing, we affirm the convictions of the Boldens, we affirm the grouping of their fraud and money laundering offenses, and we affirm the application of the Trust adjustment to Ms. Bolden. We reverse the inclusion of the Missing Invoice Costs in Ms. Bolden's fraud loss calculation. Finally, we vacate and remand on the

---

[41]In support of her position that the Trust adjustment was inappropriately applied, Ms. Bolden relies on the Eleventh Circuit's decision in *United States v. Mills*, 138 F.3d 928, 941 (11th Cir. 1998). The court there concluded that "a Medicare-funded care provider, as a matter of law, does not occupy a position of trust vis-a-vis Medicare." It based this ruling on its conclusion that Medicare-funded care providers owe contractual, rather than fiduciary, duties toward Medicare. Because of the discretion Medicaid confers upon care providers, we agree with the Second Circuit, however, that such providers owe a fiduciary duty to Medicaid. *See Wright*, 160 F.3d at 911. Indeed, we see it as paramount that Medicaid be able to "trust" its service providers.

fraud loss calculation of Mr. Bolden and on application of the vulner-
able victim adjustment to Ms. Bolden.[42]

*AFFIRMED IN PART, REVERSED IN PART,*
*VACATED IN PART, AND REMANDED*

---

[42]The Boldens have requested that, in the event we remand, their case
be reassigned to a different judge. There is no evidence to suggest that
this able district judge would have "substantial difficulty in putting out
of his . . . mind" any previously expressed views, nor do we find reas-
signment to be necessary to "preserve the appearance of justice." *See
United States v. Guglielmi*, 929 F.2d 1001, 1007 (4th Cir. 1991) (quoting
*United States v. Robin*, 553 F.2d 8, 10 (2d Cir. 1977)). In fact, because
of the nature of this case, assignment to a different judge "would entail
waste and duplication." *Id.*