**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 06-4303**

———————

UNITED STATES OF AMERICA,

                Plaintiff - Appellee,

v.

DANIEL WATLINGTON, a/k/a Gator Slim,

                Defendant – Appellant.


———————

**No. 06-4304**

———————

UNITED STATES OF AMERICA,

                Plaintiff - Appellee,

v.

THOMAS PATRICK MCGLON,

                Defendant – Appellant.

———————

Appeals from the United States District Court for the Eastern District of North Carolina, at Raleigh. James C. Fox, Senior District Judge. (5:05-cr00004-F)

———————

Argued: May 16, 2008           Decided: July 23, 2008

———————

Before NIEMEYER, KING and GREGORY, Circuit Judges.

———————

Affirmed by unpublished opinion. Judge Gregory wrote the opinion in which Judge Niemeyer and Judge King joined.

———————

**ARGUED:** Geoffrey Wuensch Hosford, HOSFORD & HOSFORD, PC, Wilmington, North Carolina; Sue Ann Genrich Berry, BOWEN, BERRY & POWERS, Wilmington, North Carolina, for Appellants. Banumathi Rangarajan, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** George E. B. Holding, United States Attorney, Anne M. Hayes, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Circuit Judge:

In this case, two white-collar criminal defendants challenge the denial of their motions for acquittal, the amount of the intended loss calculated by the district court, and the issuance of restitution orders. One of the defendants also challenges a four-level enhancement for his role in the offense. Because the district court acted properly with respect to all four of these issues, we affirm.

I.

Daniel Watlington ("Watlington") and Thomas McGlon ("McGlon"), along with others, worked together in several complicated, money-making schemes. Watlington and Bill Muwwakkil ("Muwwakkil") operated the company We Do It All ("W.D.I.A."), through which they arranged financing as loan brokers. (J.A. 1564.) Watlington also operated Financial Consultant Services ("FCS"). McGlon owned Villei International Trust, a business that offered collateral in the form of certificates of enhancement, as well as Villei International. The co-defendants engaged in four distinct money-making schemes: an advance fee scheme,[1] a counterfeit check scheme,[2] a fictitious

---

[1] Often times the clients serviced were individuals who had been incapable of obtaining a loan through conventional means who then sought financing with the defendants. The victims
(Continued)

3

Japanese bond scheme,[3] and a counterfeit certificate of deposit scheme.[4]

---

included Alvice and Janice Hunter, Juanita McNair, Jorge Rodriguez, Dr. Kathryn Kepes and Dr. Pamela Maraldo, Dr. Gayle Gibson, Penny Brooks and Tom Baker, Kevin Schullstrom and his partner, Harold Hill, III, Lester Kaltenecker, and John Johnson.

[2] Watlington and Muwwakkil gave clients cashier's checks purported to be drawn on Continental Investment Bank. Victims testified that they had to pay up front and that the loan checks they received did not clear. They were not refunded.

[3] T.P. Jones worked for Watlington, Muwwakkil, and McGlon. When he attempted to sell a series of Japanese bonds, he was arrested. (J.A. 1563.) The FBI confiscated twenty-four counterfeit bonds. The bonds had a total face value of twelve billion yen. (J.A. 467-68.) The FBI also confiscated a series of documents authenticating the bonds. The FBI's investigation revealed that the bonds had been deposited by an individual who received them from Northeast Investment Institutions, Inc. ("Northeast Investment"), a company in which McGlon, Watlington, and Muwwakkil were officers. Among the authenticating documents was a letter from Northeast Investment describing the bonds' history that included McGlon's name, passport number, and initials. There was also a letter of authenticity signed by McGlon, Muwwakkil, and Watlington. Rickie Jessie, an employee of Watlington, testified to creating the authenticating documents. (J.A. 1557.)

[4] Diether Heidenreich sought a loan. Watlington told him that Villei International Trust could issue a certificate of deposit ("CD") that could be used as collateral against a loan. Heidenreich wired Villei International Trust's attorney Clifton West $25,000 and was given a CD from the Cayman Islands issued by the Union Bank of Hong Kong. (J.A. 1968-69.) Heidenreich tried to open a brokerage account with O'Ryan Financial Services ("OFS"). (J.A. 2076-79.) He wished to borrow against the CD, but banks would not accept it without insurance. (J.A. 2080.) Finally, a businessman named Leslie Edelman agreed to loan Heidenreich money against the CD. (J.A. 2081.) Edelman's lawyer, Heidenreich's representative, and an employee of OFS participated in a conference call with someone representing
(Continued)

4

Watlington, McGlon, Muwwakkil, Clifton West ("West"),[5] Rick Jessie ("Jessie"),[6] and Gary DeBellonia ("DeBellonia")[7] were indicted with conspiracy (Count I), and wire fraud (Counts II-X).[8] Watlington, West, DeBellonia, and McGlon were also indicted with conspiracy to commit money laundering (XVIII) and fifteen counts of money laundering (Counts XIX-XXXIII). Additionally, Watlington and Muwwakkil were indicted with bank fraud (Counts XI-XIV).

---

himself as a senior officer of ICBC Bank named Kim To Wong. (J.A. 2085.) In fact, Wong was a fictitious person. A man who worked with Watlington, acting at the direction of Watlington, Muwwakkil, and McGlon, affected a Chinese accent and provided false information during the call to build confidence in the legitimacy of the CD. (J.A. 839-45.) After the phone call, Edelman agreed to make the loan and transferred 1.78 million dollars. (J.A. 2090.) When Heidenreich defaulted, the CD was found to be fraudulent and Edelman lost his investment.

[5] West was a lawyer who acted as the trust attorney for Villei International Trust.

[6] Jessie was one of Watlington's employees and occasionally the recipient of money from West's trust account.

[7] DeBellonia was the owner and operator of Management Concepts, Inc., Corporate Capital Group, and Financial Solution Resources, as well as a co-defendant in the indictment. DeBellonia owned and operated multiple companies. He allegedly operated six businesses between 1982 and 2004 with offices in multiple states and one briefly in Mexico. Watlington and DeBellonia routinely referred clients to one another.

[8] Watlington, West, and McGlon were indicted with a second set of wire fraud charges (Counts XVI and XVII).

Watlington and McGlon entered pleas of not guilty to all counts. On motion from the Government, the district court dismissed Count XXXIII with respect to Watlington and Counts X, XXVII, XXIX, XXXII, and XXXIII with respect to McGlon. The jury found both men guilty of all the remaining charges. The district court sentenced McGlon to 360 months of imprisonment, based on a calculated offense level of forty-three and a criminal history of two, and Watlington to 420 months, based on his calculated offense level of forty-three and his criminal history of three. Watlington and McGlon appealed to this Court.

## II.

Rule 29 of the Federal Rules of Criminal Procedure allows defendants to file motions for judgments of acquittal. See Fed. R. Crim. P. 29. We review the denial of such motions de novo. United States v. Smith, 451 F.3d 209, 216 (4th Cir. 2006).

### A. McGlon's Challenges

McGlon challenges his convictions on Counts II-X, XVI, and XVII (Wire Fraud and Aiding and Abetting); Counts XIX-XXXIII (Money Laundering); and Counts I and XVIII (Conspiracy to Commit Wire Fraud, Bank Fraud, False Statements/Perjury). With respect to his convictions for wire fraud, for money laundering, and for conspiracy to commit money laundering, wire fraud, and bank

6

fraud, McGlon argues that the Government failed to prove he had the requisite intent to defraud.

## 1. *Wire Fraud*

Wire fraud under § 1343 is defined as occurring when a defendant

> having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343. Wire fraud has "two essential elements: (1) the existence of a scheme to defraud and (2) the use of . . . wire communication in furtherance of that scheme." United States v. Curry, 461 F.3d 452, 457 (4th Cir. 2006) (citing United States v. Godwin, 272 F.3d 659, 666 (4th Cir. 2001); United States v. ReBrook, 58 F.3d 961, 966 (4th Cir. 1995)). To establish a scheme to defraud, the Government must prove that McGlon acted with the specific intent to defraud, which "may be inferred from the totality of the circumstances and need not be proven by direct evidence." United States v. Ham, 998 F.2d 1247, 1254 (4th Cir. 1993) (citing United States v. Saxton, 691 F.2d 712, 714 (5th Cir. 1982); United States v. Rhoads, 617 F.2d

7

1313, 1316 (8th Cir. 1980); United States v. Beecroft, 608 F.2d 753, 757 (9th Cir. 1979)).

Here, the totality of the circumstances indicates that McGlon intended to defraud the victims. West, the trust attorney for McGlon's company Villei International Trust, received the funds from many of the advance fee schemes and for the fraudulent CD scheme into his attorney trust account. West would then wire the proceeds to various recipients, often including Villei International and McGlon & Associates, both McGlon's companies. Furthermore, McGlon testified that he would use Villei International's money for his personal expenses. McGlon explained, "Well, I didn't pay myself any money. You know, it was borrowed money, so I just--all I did was borrow it from the partnership. All of the money in Villei is borrowed money." (J.A. 2199.) Additionally, Villei International Trust was often held out to victims as the source for either funding or for collateral. Even McGlon's brief states that "Villei International Trust offered collateral in the form of certificates of deposit that were credit enhancements. Mr. McGlon was introduced as the owner of Villei International Trust. Clifton West was the trust lawyer for Villei Trust." (Appellants' Br. 6.) McGlon himself encouraged these misconceptions. He produced several fraudulent documents, such as stand-by letters of credit and CDs, that were then used to

8

gain the trust of the fraud victims. At trial, Lou Ann Jackson, an employee of Federated Business Services, testified that McGlon personally directed her to prepare several documents that proved to be misleading and/or fraudulent. (J.A. 1648.) Although many of the victims dealt more directly with Muwwakkil, Watlington, and West, McGlon's involvement in and benefit from the wire fraud is clear. As a result, we affirm the district court's denial of McGlon's motion for a judgment of acquittal on multiple wire fraud counts.

## 2.  *Money Laundering*

Money laundering, as conceived by § 1956(a)(1), prohibits a much broader range of conduct than what constitutes the popular concept of money laundering. <u>United States v. Bolden</u>, 325 F.3d 471, 486 (4th Cir. 2003). Both McGlon and Watlington were charged with money laundering under § 1956(a)(1)(B)(i)[9] and conspiring to commit money laundering under § 1965(h). Section 1956(a)(1) provides:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--
> . . .
>   (B) knowing that the transaction is designed
>   in whole or in part-

---

[9] Counts XIX-XXXIII charged McGlon with money laundering pursuant to Section 1956(a)(1)(B)(i). As stated, the district court dismissed Counts XXVII, XXIX, XXXII, and XXXIII.

9

> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity

18 U.S.C. § 1956(a)(1)(B)(i). In short, to be convicted of money laundering, a defendant must first know that the property involved in the financial transaction represents the proceeds of some specified unlawful activity. Although McGlon maintains he was not aware that the funds he received were laundered fraud proceeds, the evidence that he was aware of and participated in the fraud contradict this assertion. Moreover, McGlon's multiple companies with multiple offices and his employment of West, as well as his efforts to send and receive mail at several locations, such as the Mailboxes, Etc.[10] and Edward Jones Investment,[11] indicate an attempt to divert attention from who was receiving the funds. DeBellonia testified that when he

---

[10] McGlon would receive mail addressed to both him personally and Villei International at a Mailboxes, Etc. in Dalton, GA.

[11] McGlon had an account with Edward Jones Investment in Calhoun, GA. In 1997, he met with investment representative Frances Burton Cochran ("Cochran"). (J.A. 500-01.) He told Cochran that he was receiving money from some bonds and wanted to invest it with her company. (J.A. 502.) He asked her to prepare and sign a letter on Edward Jones' letterhead, stating that Edward Jones had received twenty-four Japanese bonds from Dean Witter Reynolds. (J.A. 511-15.) He also asked Cochran if he could receive a package at that address and subsequently have it picked up and sent by Fed-Ex. (J.A. 503-09.)

first began working with Villei International Trust and McGlon, "Mr. West wanted me to be very clear that all fees that would be paid would be paid by my clients to Villei International Trust [and] would be going to his trust account. . . ." (J.A. 231.) Because the record demonstrates that the use of West's attorney trust account and the wiring of funds to several separate recipients was an attempt "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity," we affirm the district court's denial of McGlon's motion for a judgment of acquittal with respect to his money laundering convictions.

### 3. *Conspiracy*

Section 371, the general conspiracy statute, criminalizes agreements to commit substantive offenses. 18 U.S.C. § 371. To establish that a conspiracy took place, the Government must prove that there was "an agreement to commit an offense, willing participation by the defendant, and an overt act in furtherance of the conspiracy." United States v. Tucker, 376 F.3d 236, 238 (4th Cir. 2004) (citing United States v. Edwards, 188 F.3d 230, 234 (4th Cir. 1999)).

Count I charged McGlon with a multiple object conspiracy: to commit wire fraud, to commit bank fraud, and to make false

statements under oath.[12] (The Government also charged McGlon with a separate count for conspiracy to commit money laundering, which appeared in Count XVIII.) Courts have "uniformly upheld multiple-object conspiracies, and they have consistently concluded that a guilty verdict must be sustained if the evidence shows that the conspiracy furthered <u>any one</u> of the objects alleged." <u>Bolden</u>, 325 F.3d at 492 (citing <u>Griffin v. United States</u>, 502 U.S. 46 (1991) (emphasis added)). Although McGlon challenges each of these objects separately, they are all associated with the single conspiracy in Count I. Thus, despite what McGlon argues, the evidence need only show that a conspiracy furthered <u>one</u> of the three objects for the guilty verdict in Count I to be sustained. While the Court recognizes we need only to hold that one object was sufficiently proven to sustain the verdict, we address each of the objects in turn.

a. *Wire Fraud*

Above, we affirmed the district court's denial of McGlon's motion for a judgment of acquittal for his substantive wire fraud charge. Similarly, the evidence of substantive wire fraud likewise indicates McGlon's participation in the conspiracy to commit that object. For example, McGlon produced fraudulent

---

[12] Count I includes the conspiracy charge, as well as overt acts in furtherance of the conspiracy and to effect its objectives. (J.A. 67-71.)

documents which were then held out by other members of the conspiracy, such as Watlington and Muwwakkil, to defraud the victims. McGlon's lawyer, West, received the wired proceeds of the fraud and then transferred the money to McGlon or one of McGlon's companies. We, therefore, conclude that McGlon entered into an agreement to commit wire fraud, that he willingly participated in that conspiracy, and that he committed overt acts in order to further the conspiracy.

b.  *Bank Fraud*

Section 1344 prohibits knowingly defrauding or attempting to defraud a financial institution. It provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—
> (1) to defraud a financial institution; or
> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18. U.S.C. § 1344. McGlon does not challenge his conviction for substantive bank fraud. He only attacks bank fraud as an object of the Count I conspiracy charge.

In committing bank fraud, McGlon acted in concert with other individuals, including Watlington and Muwwakkil. While other members of the conspiracy played more visible roles, McGlon agreed to commit the offense, willingly participated, and

13

committed overt acts in furtherance of the conspiracy. For example, McGlon met with a victim of the counterfeit check scheme, who sought a refund of the returned check, and represented himself as an associate of Continental Investment Bank. The victim never received his money. Additionally, McGlon had documents made, such as stand-by letters of credit and CDs, which were then used in the fraud.[13] Although Watlington and Muwwakkil dealt with the fraud victims more directly, McGlon participated in the bank fraud willingly and committed overt acts to perpetuate that fraud.

c. *Perjury*

McGlon also challenges the perjury object of Count I. A person has committed perjury when he or she

---

[13] From 1999-2005, McGlon was a regular customer of Federated Business Services, a company that provides business services. One of the employees, Lou Ann Jackson ("Jackson") testified that McGlon had her scan an image of an Asian signature and then create a signature stamp using the scan. (J.A. 1668-69.) Jackson also typed documents. She recalled that McGlon would tape signatures to finished documents and make copies. (J.A. 1634-35.) Later, Jackson would insert electronic signatures, as directed by McGlon. McGlon kept the original documents. During the trial, Jackson identified several documents she had prepared for McGlon, including stand-by letters of credit and CDs. While awaiting trial, McGlon filed a criminal complaint against Jackson, alleging she committed fraud and made a fraudulent statement under oath during the FBI investigation. (J.A. 2297-2300.) He denied giving her any instructions or signatures. Villei International also obtained business services from a Bahamas-based business named Presidential Services. (J.A. 1059-61.) The company sent and received faxes. The company also prepared a document with the Union Bank name and address.

14

(1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; or

(2) in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true.

18 U.S.C. § 1621. Again, McGlon does not challenge a substantive perjury conviction,[14] but rather the perjury object of his conspiracy conviction.

As mentioned, one of the schemes perpetrated by the defendants consisted of passing off fraudulent Japanese bonds as genuine. During a deposition with the SEC, McGlon denied any knowledge of the counterfeit bonds:

Q: Did the fact that the other bonds were seized concern you?

A: No, it had nothing to do with it.

Q: Why did you think they were seized?

A: I guess because they were phoney. I have no idea.

Q: Did the notion that Northeast was working on some phoney bonds concern you?

A: Not at all.

Q: Why not?

---

[14] There was no independent, substantive perjury charge.

15

A: Why would it, you know? It has nothing to do with me, period.

(J.A. 1123.) Watlington similarly claimed the bonds were authentic. (J.A. 1114.)

Yet contrary to McGlon's and Watlington's depositions, at trial, the owner of a printing and graphics company testified that McGlon had contacted him about producing a certificate with a hand-drawn border. (J.A. 528-30.) The printer referred McGlon to a graphic designer who took the project. (J.A. 530.) McGlon later gave the graphic designer foreign characters to add to the design, telling him that the certificates were part of a gift to twelve Japanese salesmen reflecting the amount of product they had sold. When the graphic designer was finished the printer printed and embossed the certificates using a special paper provided by McGlon. Additionally, the FBI's investigation revealed that the bonds had been deposited by an individual who received them from Northeast Investment, a company in which McGlon, Watlington, and Muwwakkil were officers. Among the authenticating documents was a letter from Northeast Investment describing the bonds' history that included McGlon's name, passport number, and initials. There was also a letter of authenticity signed by McGlon, Muwwakkil, and Watlington.

This evidence indicates that McGlon was well-aware that the bonds were fraudulent at the time he was deposed. Thus, while it is clear that both McGlon and Watlington lied under oath, whether they coordinated those untruths is unknown. That said, although there is not as much evidence supporting the false statement object as that which supports the wire and bank fraud conspiracy objects, the Court need only establish one of the objects to affirm the conspiracy conviction in Count I.

In sum, given McGlon's relationship with Muwwakkil, Watlington, West, and other members of the conspiracy established by the record, as well as his own actions in furtherance of the conspiracy, we sustain the guilty verdict against McGlon on Count I. We, therefore, affirm the district court's denial of McGlon's motion for a judgment of acquittal for Count I.

d.  *Money Laundering*

Above, we affirmed the district court with respect to McGlon's substantive money laundering convictions. However, McGlon also challenges the associated conspiracy conviction pursuant to § 1956(h), found in Count XVIII. Section 1956(h) provides that "[a]ny person who conspires to commit any offense defined in this section or § 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." 18 U.S.C. § 1956(h).

17

Again, West acted as Villei International Trust's trust attorney and West's attorney trust account was a major situs of the money laundering. Because McGlon's companies received the laundered money and he paid personal expenses with the money he received, we conclude that McGlon entered into an agreement to receive the laundered funds from West's attorney trust account. As a result, we likewise affirm the denial of the motion for judgment of acquittal with respect to McGlon's Count XVIII.

**B.    Watlington**

Watlington challenges his conviction of conspiracy to make materially false statements in Count I and his conviction of money laundering in Counts XIX-XXXII.

**1.    *Conspiracy to Make Materially False Statements/Perjury***

Unlike McGlon, who challenged the conspiracy alleged in Count I with respect to all three objects, Watlington challenges only the third object, perjury. As stated, courts have consistently sustained guilty verdicts in multiple-object conspiracy charges when evidence demonstrates that the conspiracy furthered just one of those objects. Bolden, 325 F.3d at 492 (citing Griffin v. United States, 502 U.S. 46 (1991); United States v. Hudgins, 120 F.3d 483, 487 (4th Cir. 1997)). Moreover, Watlington does not challenge his substantive convictions for bank and wire fraud. Because only one of those objects need be established as furthered by the conspiracy, and

18

Watlington challenges only one of three of the objects, we affirm the verdict in Count I.

## 2. *Money Laundering*

As stated previously, the crime of money laundering under § 1956 is rather broad. Watlington argues that it was not West's intent to launder money but to distribute earned funds and that if West, as the principal, had no criminal intent, neither could Watlington as an aider and abettor. The foundational premise of Watlington's argument, mainly that West had no intent to launder money as defined in § 1956, is patently false. Channeling the funds for various schemes through West's attorney trust account is a clear attempt "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i). Moreover, according to West's records, Watlington directly received the laundered funds from West's accounts. Thus, we affirm the district court's denial of Watlington's motion for a judgment of acquittal for money laundering.

## III.

Although issues regarding the definition of intended loss are subject to de novo review, we review the factual determination of the intended loss for clear error. United

19

States v. Wells, 163 F.3d 889, 900 (4th Cir. 1998). Only a preponderance of the evidence must support the findings.

An intended loss is "the pecuniary harm that was intended to result from an offense," including a harm that would have been impossible or unlikely to occur. U.S.S.G. § 2B1.1 cmt. n.3(A)(ii). "[T]he Guidelines permit courts to use intended loss in calculating a defendant's sentence." United States v. Miller, 316 F.3d 495, 502 (4th Cir. 2003). Additionally, intended losses, according to former United States Sentencing Guidelines Section 2F1.1 (deleted by consolidation with U.S.S.G. § 2B1.1), do not need to be determined with precision: a court must only make a reasonable estimate of loss, given the available information. See U.S.S.G. § 2B1.1 cmt. n.3(C) ("The court need only make a reasonable estimate of the loss."); see also United States v. Jackson, 524 F.3d 532, 547 (4th Cir. 2008).

The district court calculated intended loss according to the face value of the counterfeit CDs and Japanese bonds and according to the actual loss of the advance fees. McGlon and Watlington argue that the district court erred in using the face value of the counterfeit documents in making its calculation. They assert that "[n]o one would pay the face value of the CDs when Watlington and West attempted to borrow against them." (Appellants' Br. 52.) They also maintain that "[a]dding the

20

face value of the CDs artificially inflates the intended loss figure." (Appellants' Br. 53.) Although it may have been unlikely that the members of the conspiracy could have borrowed up to the face value amount of the fraudulent certificate of deposit, intended loss, as defined, can encompass the unlikely as well as the impossible. See U.S.S.G. § 2B1.1 cmt. n.3(A)(ii). It, therefore, was not clear error on the part of the district court to have valued the fraudulent CDs at their face value for the purposes of calculating the intended loss.

Further, McGlon and Watlington attack the calculated worth of the fraudulent Japanese bonds, arguing that the district court should have valued them at four and a half million dollars, as testified by Special Agent Tong. (Appellants' Br. 54.) Tong calculated the value using the conversion rate at the time of trial. However, the conspirators intended to profit from the bonds when they were generated in 1997, not when Tong made his assessment in 2005. Thus, the district court used the exchange rate at the time the bonds were produced, which yielded a higher number than if the value had been calculated at the time of the trial. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 396 (1948). Because the

21

district court did not make such a mistake by using the exchange rate at the time of the crimes when calculating of intended loss, we affirm the district court.

IV.

McGlon and Watlington also challenge the restitution ordered by the district court. This Court reviews criminal restitution orders for abuse of discretion. United States v. Henoud, 81 F.3d 484, 487 (4th Cir. 1996) (citing United States v. Hoyle, 33 F.3d 415, 420 (4th Cir. 1994)).

McGlon and Watlington challenge several aspects of the district court's restitution order. They assert that the district court erred in ordering restitution to entities who were not actually "victims" under the law. Moreover, McGlon and Watlington argue that the restitution figure itself was higher than that found in the presentencing reports. McGlon asserts that RBC Centura, Bank of America, and Richmond Savings Bank cannot, by definition, be victims under the Mandatory Victim Restitution Act ("MVRA"), as they are not "persons."[15] (Appellants' Br. 58.) Additionally, with regard to the financial institutions, McGlon alleges that there is no

---

[15] The banks were looking into returned checks from Continental Investment Bank in conjunction with the counterfeit check scheme.

connection between the counts of the conviction and the institutions. Lastly, in reference to RBC Centura Bank, they argue that the district court increased the restitution outlined in the presentencing report without justification.

McGlon also challenges the restitution ordered to Gayle, Gibson, Leslie Edelman, Alvin and Janice Hunter, Joseph Norman, and Elijah Stevenson. (Appellants' Br. 58-60.) With regard to Gibson, he argues that the district court increased the restitution amount from that in the presentencing report by $24,000. He asserts that Edelman, who loaned money to Heidenreich based on the fraudulent CD and the phone call in which one of Watlington's associates impersonated a Chinese banker, was not a victim of any of the offenses. He argues nothing is owed to the Hunters because they merely gave cashier's checks to Watlington. Moreover, McGlon maintains that Norman was not a victim and that there was an unexplained increase in the amount of restitution from the presentencing report. Lastly, McGlon maintains that Stevenson is not a victim under the statute, as he gave checks directly to Watlington. Similarly, Watlington objects to restitution with respect to several victims.[16]

---

[16] Watlington objects to the restitution to Roderick Mims, Jimtown First Baptist Church c/o Bill Bingham, Danny E. Elkins, Jr., James Harrison, Leslie Edelman d/b/a Kimber Manufacturing, (Continued)

23

The MVRA provides for crimes of violence, offenses against property, and crimes related to tampering due to which a victim has suffered either a physical or pecuniary loss, "the court shall order, in addition to, or in the case of a misdemeanor, in addition to or in lieu of, any other penalty authorized by law, that the defendant make restitution to the victim of the offense or, if the victim is deceased, to the victim's estate." 18 U.S.C. § 3663A(a)(1). The MVRA defines a victim as

> a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

Id. § 3663A(a)(2). Thus, both those who are directly harmed and those who are proximately harmed are entitled to restitution. Moreover, this Circuit has upheld the payment of restitution pursuant to the MVRA when the victims are financial institutions. See, e.g., United States v. Alalade, 204 F.3d 536 (4th Cir. 2000). As a result, Watlington's argument that banks do not meet the definition of victim under the MVRA fails.

---

Inc., Carlos Sanchez, Lennox Slinger, Richard Lamos, Wayne Adams, Bennett J. Severson, the Hunters, Stevenson, Bank of America, Richmond Savings Bank, and RBC Centura. (Appellant's Br. 61.)

24

"In order to assure effective appellate review of restitution orders, this circuit requires sentencing courts to make specific, explicit findings of fact on each of the factors set forth in § 3664(a)." United States v. Molen, 9 F.3d 1084, 1086 (4th Cir. 1993). Section 3664(a) states that

> the court shall order the probation officer to obtain and include in its presentence report, or in a separate report, as the court may direct, information sufficient for the court to exercise its discretion in fashioning a restitution order. The report shall include, to the extent practicable, a complete accounting of the losses to each victim, any restitution owed pursuant to a plea agreement, and information relating to the economic circumstances of each defendant.

18 U.S.C. § 3664(a). In United States v. Molen, we explained that "these findings of fact must key a defendant's financial resources, financial needs, and earning ability to the type and amount of restitution." Molen, 9 F.3d at 1086 (citing United States v. Bruchey, 810 F.2d 456, 459 (4th Cir. 1987)). A district court may satisfy these requirements in one of two ways: by making factual findings or by adopting an adequate presentencing report.

With respect to restitution, the presentencing report for both defendants stated:

> restitution must be ordered in this case without regard for the defendant's ability to pay. However, the exact amount of restitution owed in this case has not been determined at this time. Due to the complexity of the issue, the matter of restitution is still under investigation by this office and the

25

> government. A separate restitution hearing has been
> requested to address the issue of restitution pursuant
> to 18 U.S.C. § 3666A.

(J.A. 2653, ¶88; J.A. 2718, ¶72.) The district court held restitution hearings for both McGlon and Watlington.

Before the hearings, both McGlon and Watlington had the opportunity to submit written objections to the probation officer's findings in the presentencing reports. While both filed objections with the district court, neither defendant submitted any new evidence in support of their challenges. The probation officer filed addenda to the reports. The probation officer then filed additional addenda to the presentencing reports on the issue of restitution. During the restitution hearings, neither Watlington nor McGlon presented any additional evidence in support of their objections. Ultimately, the district court accepted the presentencing reports' findings.

Because the district court may adopt the factual findings in the presentencing report and neither defendant brought forth any evidence to the contrary in his objections, the district court did not abuse its discretion by ordering restitution based on the findings found in the report.

V.

Finally, we address McGlon's challenge to the four-level sentencing enhancement for his role in the offense. To give the

proper deference to the district court's application of the Sentencing Guidelines, this Court reviews factual determinations for clear error and legal questions de novo. United States v. Blake, 81 F.3d 498, 503 (4th Cir. 1996) (citing United States v. Singh, 54 F.3d 1182, 1190 (4th Cir. 1995)).

The United States Sentencing Guidelines allow for a four-level enhancement if the defendant was the leader, or organizer, of criminal activity that involves five or more participants or was in some other way extensive. U.S.S.G. § 3B1.1(a). The presentencing report, thus, recommended that McGlon's offense level be adjusted by four, alleging that "McGlon organized the offense and directed the activities of Watlington, additionally, the offense was extensive and involved more than five persons." (J.A. 2715.)

However, in its statement of reasons, the district court found that "the defendant should not receive 4 points for his rose [sic] in the offense and therefore reduces the 4 points to zero. However the offense level of 43 does not change as the offense level cannot go below 43 in this matter." (J.A. 2732.) Additionally, the Government points out a four-point reduction would have had no effect on McGlon's sentencing range, as after subtracting four points from his offense level of 48, his offense level would have been 44, and the Guidelines limited his

27

total offense level to 43.  (Appellee's Br. 2, n.2.)  We, therefore, dismiss this issue as moot.

VI.

Given the evidence against them, the denial of McGlon's and Watlington's motions for judgments of acquittal was proper. Furthermore, the district court's calculation of the intended loss was not clearly erroneous.  Because Watlington and McGlon failed to present any evidence in opposition to the findings contained in the presentencing report, the district court did not abuse its discretion in ordering restitution based on those findings.  Accordingly, we affirm the district court.

AFFIRMED